FIRST DIVISION

No. 1-07-3362

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 CR 25508 |
| | ) | |
| PIERRE HOUSEWORTH, | ) | Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE ROBERT E. GORDON delivered the opinion of the court:

This case involves the first-degree-murder trial of defendant Pierre Houseworth, age 21, for the stabbing death of Naomi Quashie, who at the time of her death was 20 years old. Defendant and Naomi had dated on and off for several years prior to October 17, 2003, the date of Naomi's death. Defendant and Naomi had "broken up" a few months before October 17, 2003. On the afternoon of that day, defendant used public transportation to travel from his home on Chicago's west side to Chicago's north side where Naomi lived with her mother at 2837 ½ North Sawyer Avenue with the hope of reconciling his relationship with Naomi. Defendant and Naomi spoke outside of her home; a physical conflict ensued, which ended when defendant stabbed Naomi multiple times, causing her death. Defendant fled, discarded the murder weapon, and boarded a

No.  1-07-3362

Chicago Transit Authority (CTA) elevated train.  He was arrested soon thereafter and provided verbal inculpatory statements to police and prosecutors.

Defendant was indicted for first-degree murder.  He pleaded not guilty and asserted the affirmative defense of insanity.  720 ILCS 5/6-2 (West 2004).  The main issue at trial involved whether defendant was sane at the time of the offense, and conflicting expert testimony was presented to that effect.  Following a bench trial, the trial court found defendant sane at the time of the offense and found him guilty but mentally ill (720 ILCS 5/6-2(c) (West 2004) ("[a] person who, at the time of the commission of a criminal offense, was not insane but was suffering from a mental illness, is not relieved of criminal responsibility for his conduct and may be found guilty but mentally ill")), of the first-degree murder of Naomi.  A sentencing hearing was conducted where mitigation and aggravation were presented.  The trial court sentenced defendant to a 30-year term in the Illinois Department of Corrections.  Defendant filed a motion for a new trial, which was denied.  On appeal, defendant argues that (1) the trial court's finding that defendant was sane at the time of the offense was against the manifest weight of the evidence, and (2) he received ineffective assistance of counsel. We affirm.

## I.  BACKGROUND

On October 17, 2003, Naomi resided with her mother at 2837 ½ North Sawyer Avenue in Chicago.  Naomi's mother, Janet Quashie, testified at trial.  She testified that she has known defendant for several years because he and Naomi had dated, on and off,

since Naomi was 13 years old; they had broken up about three months prior to October 2003. She testified that Naomi had lived with defendant in the past.

A. The Homicide, Arrest, and Postarrest Inculpatory Statements

At around 7:30 p.m. on October 17, 2003, Mrs. Quashie was home alone watching television and having dinner. After she finished her dinner, she walked to her apartment's kitchen, when she heard defendant's and Naomi's voices coming from outdoors through an open window. She heard Naomi say, "Why do you want to do this to me? Please, please, please, I am begging you, don't do this. Don't do this." Mrs. Quashie opened her apartment's back door and observed defendant "standing there in front of my daughter *** waiting for her to pass out for good so that he can leave."

Defendant, who was carrying a black backpack, fled. Mrs. Quashie pursued defendant through an alley but was unable to catch him. She testified that defendant ran toward the CTA's Kedzie Street train station. She returned home and called the police. Naomi had been stabbed multiple times about her face and body. Ms. Quashie testified that she knew "he [defendant] just killed my daughter."

Chicago police officer Retamozo (whose first name is not included in the record) testified that pursuant to a police dispatch, which included defendant's name and description, he, his partner, Officer Trempe, and several other Chicago police officers stopped a CTA train at the Logan Square train station (one stop south of the Kedzie Street train station) at approximately 7:30 p.m. on October 17, 2003. A search of the train resulted in defendant's arrest. Defendant was read his *Miranda* warnings. The police recovered a large steak knife from defendant's backpack, which had no blood on

3

it. Defendant was then transported in Officer's Retamozo's police motor vehicle to the Area 5 police headquarters located on Grand and Central Avenues in Chicago. While in transit to the police station, defendant stated that he went to Naomi's home to reconcile with her. After defendant and Naomi argued, defendant told Naomi that he was going to commit suicide. Naomi urged defendant to "go ahead and do it." Defendant, who had visible scratches on his face, then told the officers that he struck Naomi and that she retaliated by scratching his face. Defendant stated that he then "took out the knife," but did not admit that he stabbed Naomi.

A certified copy of the medical examiner's report prepared by Dr. Denton (whose first name is not disclosed by this record), who performed the autopsy, was admitted into evidence without objection, and the defense stipulated that if Dr. Denton was called to testify, he would testify that to a reasonable degree of medical certainty, Naomi died as a result of multiple stab wounds.

Chicago police detective John Trahanas testified that on October 17, 2003, he and his since-retired partner, Detective Janet Howard, visited the crime scene and later spoke to Mrs. Quashie at the Area 5 police station. Detective Trahanas interviewed defendant at around 9:30 p.m. on October 17, 2003. The detective read defendant his *Miranda* warnings, which defendant acknowledged and waived before making a statement. Assistant Cook County State's Attorney James Papa arrived at Area 5 at about 11:30 p.m. that same evening and took defendant's statement after reading him his *Miranda* warnings.

Defendant consented to have his statement videotaped. Assistant Cook County State's Attorney Lorna Amado-Chevlin arrived at Area 5, read defendant his *Miranda* warnings, obtained defendant's consent to videotape his statement, and took his videotaped statement at around 3 a.m. the following morning.[1] Defendant repeatedly claimed that he had traveled to Naomi's home to reconcile with her and never admitted that he desired to kill her. Defendant admitted that he traveled to Naomi's home the evening of October 17, 2003, with two large steak knives in his possession. He admitted that after the physical altercation with Naomi, he removed one of the knives from the black backpack he was carrying. He did not remember stabbing Naomi. The next thing he remembers after removing the knife was someone screaming. He then saw blood on Naomi, himself, and the knife he was holding. Defendant fled and discarded the knife with the blood on it in a sewer. Defendant was never asked if he was suffering from a mental illness, if he was on medication, or if he had any general health problems. Defendant was also never asked why he was carrying a steak knife.

Brian Schoon, a DNA analyst at the Illinois State Police crime laboratory, tested DNA recovered from defendant's shoes and found that it matched Naomi's DNA.

---

[1] The record reveals that the videotape was played in open court; however, the videotape is not included in the record on appeal.

### B. Defendant's Social and Mental Health History

The epicenter at trial involved conflicting expert testimony regarding whether defendant was sane at the time of Naomi's slaying. A review of defendant's social and mental health history, including his prearrest and postarrest mental health medical treatment, is necessary for an understanding of the psychiatric opinions offered by the experts in the case at bar. The following recitation is taken from the past histories prepared by the experts in this case.

The record reveals that defendant was a low-birth-weight identical twin born to a single mother. Defendant and his twin brother spent three years in foster care as young children, although the record of this case does not reveal their exact ages at that time. There is some evidence in the record to suggest that they may have been abused sexually while in the foster care setting. Both defendant and his twin brother had "learning difficulties" but defendant was "slower" than his brother. Both were placed into special education classes. Defendant's brother advanced at a greater scholastic pace and was eventually placed into regular classes. From that point, they were educated separately but depended on each other for emotional support. Defendant was "very close" to his brother.

At the age of 13, defendant's brother drowned in a swimming pool accident while they were on a school field trip. From one of the medical reports, defendant recalled observing a teacher pull his brother from the water and begin the administration of cardiopulmonary resuscitation (CPR). An ambulance arrived. Defendant's brother was pronounced dead at the hospital.

6

Defendant's personality changed after his brother's death. He became depressed with frequent crying spells. He appeared careless and often expressed suicidal ideations. His behavior in school changed and he began having disciplinary problems. He was arrested for pushing a female classmate into a locker. He began having problems at home and began stealing from his mother. One of the medical reports states that defendant considered suicide, but did not act on his feeling "out of fear." He was evaluated and found to be clinically depressed as early as 2000 when he expressed feelings of worthlessness and guilt for his brother's death. Defendant was eventually prescribed Prozac, an antidepressant medication. In 2000 defendant was struck in the head with a bicycle; he was taken to the emergency room and released almost immediately. In 2002, defendant attempted suicide on two occasions. During the first attempt, defendant drank large amounts of vodka and ingested large amounts of aspirin. During the second attempt, he cut his left thigh with a razor blade. He reported, "I only bled a lot. I did not die."

One of the medical reports states that Naomi had lived with defendant and his mother at one point in time. Defendant's mother reported that defendant and Naomi argued constantly. Naomi was disrespectful to defendant's mother and "ran up" expensive telephone bills when she called psychic hotlines. Defendant's mother eventually asked Naomi to leave her home.

In 2003, defendant was battered by four males on the street utilizing a "2 x 4 foot" wooden plank. He sustained a fractured arm. One of the expert's reports states that

defendant was rendered unconscious although the ambulatory services report from that day reveals no mention of defendant being rendered unconscious.

Defendant received mental health treatment after his arrest for the crime in question. Medical records from Cermak Health Services (Cermak) in Chicago reveal that defendant was prescribed three psychotropic medications including Effexor, an antidepressant, Depakote, a mood stabilizer, and Geodon, an antipsychotic medication. The medical records from Cermak reveal that defendant had "self-report[s] of auditory hallucination[s]" where defendant reported hearing Naomi speaking to him after her death. Defendant attempted suicide while incarcerated.

Prior to trial, the trial court ordered a behavioral clinical examination (BCX) to determine defendant's fitness to stand trial, ability to understand *Miranda* warnings, and sanity. In Illinois, a defendant is fit to stand trial if he " 'has sufficient present ability to consult with defense counsel with a reasonable degree of rational understanding and *** has both a rational and factual understanding of the proceedings.' " (Emphasis omitted.) *People v. Schoreck*, 384 Ill. App. 3d 904, 916 (2008), quoting *People v. Baugh*, 358 Ill. App. 3d 718, 732 (2005). The definition of "fit to stand trial," differs from the Illinois definition of "insanity." In Illinois, a person is insane and not "criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks the substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2004). The BCX conducted at Cook County Forensic Clinical Services concluded that defendant was fit to stand trial, had the ability to understand *Miranda*

warnings, and was sane at the time of the administration of the BCX. No issue is raised in this appeal that defendant was not fit to stand trial.

### C. Pretrial Proceedings

On the day that defendant's bench trial was scheduled to commence, defendant requested leave to file a motion to suppress his postarrest inculpatory statements. In requesting leave, defense counsel stated that the motion "ha[d] nothing to do with the trial" because defendant had already been evaluated as able to comprehend *Miranda* warnings. Trial counsel sought leave to file the motion to properly "perfect the record" and that the motion was "housekeeping." The State objected to the motion as being untimely.

On record, the trial court stated that the motion was more than "housekeeping" and suggested that the parties reach a resolution. After a short recess, the parties answered ready for trial. At that time, defense counsel stated that he had considered filing a motion to suppress defendant's postarrest inculpatory statements, "[b]ut after considering all the information at my disposal, I felt that it was not in the best interest of my client to proceed on this motion at this time, so we'll proceed directly to trial."

D. Expert Testimony Regarding Defendant's Sanity at the time of Naomi's Slaying

Defendant presented the testimony of Dr. Patricia Newton, a psychiatrist for 35 years, who is licensed to practice psychiatry in Maryland. Dr. Newton testified that she had never testified in Illinois on the issue of sanity.

On direct examination, Dr. Newton testified that she was contacted by defense counsel to evaluate defendant and that she subsequently interviewed defendant for a duration of three hours while he was incarcerated at the Cook County correctional facility. At that time, defendant was medicating with three different psychotropic medications prescribed by Cermak. Dr. Newton testified that during the interview she took a "previous history" of defendant to formulate a "longitudinal profile *** [which] means what his life or what his mental status ha[d] been like over time." Dr. Newton testified that defendant had experienced three past traumatic events that influenced his mental status. The first event occurred when, at the age of 13, defendant's identical twin brother drowned in a swimming pool accident during a school field trip. Dr. Newton testified that defendant had been "evaluated psychologically and found to be depressed and in need of treatment." The second event occurred in 2000, when he was struck in the head with a bicycle; defendant was admitted and released from the emergency room. The third event occurred in 2003, when defendant was battered by four people using a "2 x 4 foot" wooden plank, which resulted in a fractured arm and unconsciousness. Defendant was hospitalized after the 2003 incident.

Dr. Newton also testified that she interviewed defendant's mother, reviewed some of defendant's medical records, and ordered an electroencephalography (EEG), a

10

diagnostic examination utilized to detect electrical disturbances in the brain, in preparing her evaluation. The "awake EEG" did not reveal electrical disturbances in defendant's brain. She also testified that although she had ordered an "asleep EEG," that test was never performed. Based upon her interview of defendant and defendant's mother, and her review of some of defendant's medical records, Dr. Newton opined that "[defendant] was not criminally responsible for his conduct at the time of the alleged incident resulting in the death of Naomi. [Defendant] at the time was not capable of conforming his behavior to the letter of the law." Dr. Newton testified that defendant suffered amnesia when he was struck in the face by Naomi on October 17, 2003, and that he could not recall the events that transpired immediately thereafter. Dr. Newton testified that defendant "came to consciousness" when someone screamed and that defendant "did not have a memory of what was going on until someone screamed and he looked and saw the blood and then he ran."

Dr. Newton testified that she diagnosed defendant with posttraumatic stress disorder and postconcussion syndrome, which the doctor explained as "a series of symptoms that occurs after the event of head trauma." Dr. Newton testified that postconcussion syndrome involves three elements or components including (1) physical, (2) emotional, and (3) cognitive. Dr. Newton testified that the physical component of postconcussion syndrome was not an issue in the case at bar. She testified that "emotional issues have to do around irritability, have to do around depression, anxiety; those things." She testified that "[t]he cognitive areas, though, which have been documented pretty well in people's postconcussion syndrome have to do with a person's

judgment, a person's ability to recall certain events, a person's ability to be able to have association; in other words, to associate symptoms from one situation to another." Dr. Newton testified that defendant would not have had the ability to distinguish between right and wrong if he were suffering from postconcussion syndrome.

On cross-examination, Dr. Newton testified that the day she interviewed defendant his "mood and affect appeared to be depressed," that he had an "[a]verage intellect," and that he was oriented to time, person, and place. Dr. Newton testified that "[i]f defendant had been suffering from posttraumatic stress disorder alone that may or may not have an effect [on sanity]." Dr. Newton testified that defendant "was suffering from postconcussion syndrome in addition to posttraumatic stress disorder." Dr. Newton testified that persons suffering with postconcussion syndrome "would not be able to have a conscious state to help them discern what is going on." She testified that "data supports that postconcussion syndrome people have difficulty with judgment, that's a classic symptom, they have difficulty with spatial arrangements, they have difficulty with making association. That's documented in the literature." Dr. Newton testified that defendant "had a sensitive area in his head" and when Naomi struck him on the evening of October 17, 2003, he suffered hypoxia, which is a decreased flow of oxygen to the brain that "could have an effect on his ability to understand everything and make rational judgments because the data and the literature does support that judgment, that abstract thinking, that associations in terms of spacial adjustments, in terms of reasoning and rational behavior is effected by *** postconcussion syndrome."

Dr. Newton testified that the intensity of the head trauma caused by Naomi striking defendant was unimportant because the trauma leading to hypoxia "doesn't have to be a major hit"; rather, the trauma could be "anything that disrupts cerebral spinal fluid. You can see it on whiplash injury without anybody being hit at all and still get post-concussion syndrome." Dr. Newton testified that the stress of the confrontation with Naomi exacerbated defendant's postconcussion syndrome.

Dr. Newton also testified that defendant knew that stabbing someone was wrong when he carried two knives to Naomi's home and that he knew the difference between right and wrong when Naomi hit him. Dr. Newton testified that defendant reported remembering being struck and remembered pulling out a knife. Defendant reported that the next thing he remembered was someone screaming. Dr. Newton testified that defendant did not remember stabbing Naomi because of the "hypoxia that he's experienced." Dr. Newton testified that defendant came to consciousness "when someone screamed" and that "he did not have a memory of what was going on until someone screamed and he looked and saw the blood and then he ran." Further, Dr. Newton testified that defendant's action of discarding the murder weapon in a sewer did not necessarily mean that he knew his actions were wrong at that point in time.

Dr. Newton testified that defendant had related to her that he could not recall the medications he was taking. Dr. Newton recalled that defendant had told her that he "did not fight [Naomi]" and that "she was just swinging at him." Dr. Newton stated that "it occurred" to her that defendant may not have been honest with her during the interview. Dr. Newton also testified that she did not have the medical examiner's report when she

13

made her diagnosis and that she wrote her report a year and five months after her interview with defendant. Dr. Newton then stated that postconcussion syndrome was not included as a mental illness by the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV). Dr. Newton then testified that she was part of a committee for the DSM-IV for the American Psychiatric Association "[a]nd I do know that it is a composite and a compromised document. It is what we have as a guideline, but it is not the be-all to end all" because the "DSM-IV is limited in terms of its diagnostic abilities in the clinical area." Dr. Newton then testified that her understanding of "insanity" was "that at the time that a person is – is not aware of – they're suffering from a disease or defect that makes them not able to conform to the law."

After Dr. Newton's testimony, the defense rested. The trial court admonished defendant regarding his right to testify. The trial court asked defendant whether he understood that he had a right to testify and defendant responded that he did know that he had such a right. The trial court then asked defendant whether he had discussed the possibility of him testifying with his attorney. After defendant responded that he had not discussed the matter with his attorney, the trial court again asked whether he knew he had a right to testify and defendant indicated that he did. Defendant then stated that it was his decision not to testify, that he had not been threatened, forced, or promised anything in exchange for not testifying, and that he desired to rest his case-in-chief.

In rebuttal, the State called Dr. Fidel Echevarria, a forensic psychiatrist of the Cook County Department of Forensic Clinical Services, who performed the court ordered pretrial BCX evaluation of defendant. Dr. Echevarria testified that he evaluated

14

defendant on June 18, 2004, and at that time, defendant appeared "what I consider normal. He responded to my requests to identify himself when I called out his name. He followed me and followed instructions into the interview room and he appeared orientated in terms of time and space." Dr. Echevarria testified that defendant was in custody at the time of the interview. Dr. Echevarria testified that defendant's medical record from Cermak revealed that defendant was medicating with "three psychotropic medications including an anti-depressant medication known as [E]ffexor ***, 75 milligrams per day, a mood stabilizing medication known as [D]epakote ***, 750 milligrams twice per day, and an anti-psychotic medication known as [G]eodon [sic] ***, 80 milligrams twice per day." Dr. Echevarria testified that defendant's medical records revealed "self-reports of auditory hallucinations" where defendant reported hearing Naomi speaking to him after her death. Dr. Echevarria testified that defendant did not report any auditory or visual hallucinations during his evaluation.

Dr. Echevarria testified that defendant's thought process "was goal directed, linear, coherent, logical." Dr. Echevarria testified that goal-directed behavior was "purposeful behavior; that is there is presumably a rational motive for what a person does." Dr. Echevarria testified that he did not detect any symptoms that were consistent with an untreated anxiety mood disorder or a psychotic illness. Dr. Echevarria testified that defendant was able to report his life history, that his long- and short-term memory were intact, that his immediate recall was intact, and that his insight and judgment were "grossly intact."

Dr. Echevarria testified that a person is legally insane under Illinois law "if at the time of [the] conduct as a result of a mental defect or mental disease they lack the substantial capacity to appreciate the criminality of their alleged behavior." Dr. Echevarria testified that based on his review of defendant's medical records, the police reports, and his interview of defendant, his opinion, to a reasonable degree of psychiatric certainty, was that defendant was sane at the time of the offense because "defendant's report to me of his behavior prior to the incident and following the incident, all the behaviors he reported, his recollection of events as they were all rational and goal directed without any evidence of any psychotic processing at that time."

Dr. Echevarria testified that there was a rational motive for defendant's actions, which was his anger over Naomi ending their relationship. Dr. Echevarria also testified that defendant's actions of fleeing and discarding the murder weapon "indicate[d] that there [was] an understanding that – as to the trouble he can get himself in if he is found with a weapon, a murder weapon in hand and his attempts to hide and cover his own involvement." Dr. Echevarria further opined that all of the foregoing factors led him to the conclusion that defendant knew his actions were criminal.

Dr. Echevarria testified that he requested Dr. Erick Nue, a clinical psychologist, also of the Cook County Department of Forensic Clinical Services, to conduct certain diagnostic examinations of defendant to determine his Wechsler Adult Intelligence Scale (IQ Score) and to conduct an independent assessment of sanity and whether defendant had the ability to understand his *Miranda* rights. Dr. Nue's opinion was that defendant was legally sane at the time of the occurrence. Dr. Nue determined that defendant's IQ

16

score was 76, which meant that defendant operated at a lower level of intelligence than people his age, but defendant's IQ was above the level of mental retardation.

Dr. Echevarria then testified that he had reviewed Dr. Newton's report and disagreed that defendant was suffering from posttraumatic stress disorder because of "what the defendant did not report to me. In order to make a diagnosis of posttraumatic stress disorder there [are certain] symptoms that have to – at least some of them have to be present. And from his self-reports and from what I could elicit there was nothing to support that diagnosis." Additionally, Dr. Echevarria testified that he had "never heard" of a mental illness known as "postconcussion syndrome" and that such an illness was not listed by the DSM-IV.

Dr. Echevarria testified that defendant's recollection of the crime while "spotty" was adequate because defendant could recall arguing and fighting with Naomi, hearing Naomi's mother calling for her, and hearing a noise that caused him to flee. Dr. Echevarria diagnosed defendant with "situational depression," which occurs when "a person becomes depressed in response to something. It could be *** some stressor or some act. Usually situational depressions are not clinical depressions in the sense that they do not sustain passed a two-week period. The intensity of their symptoms may not be the same as a symptom of a major depressive disorder." Dr. Echevarria testified that defendant's depression would not affect his sanity.

On cross-examination, Dr. Echevarria testified that simply because defendant was prescribed psychotropic medications did not necessarily mean that defendant was unable to think rationally. Further, the doctor testified that the DSM-IV is "as absolute [as the

field of psychiatry] gets." The doctor testified that a cranial computed tomography (CT) scan would not measure electrical disturbances in a patient's brain and he testified that he did not order a magnetic resonance imaging (MRI) or a positron emission tomography (PET) scan because in his medical opinion, such tests were unnecessary to reaching a conclusion regarding defendant's sanity.

On redirect examination, Dr. Echevarria testified that Dr. Newton found defendant to have sufficient intellectual functioning and that there was nothing to suggest that defendant suffered from psychosis. Dr. Echevarria testified that even if defendant's auditory hallucinations were true that would not be indicative of psychosis because "[t]here could be other reasons why a person would have that experience, including guilt or reports of *** wanting to come across as mentally ill." On recross-examination, Dr. Echevarria denied that an awake EEG did not measure electrical activity in the brain because he stated that the diagnostic examination's sole purpose was to test electrical activity in the brain.

The State then rested its rebuttal case. Defendant requested and was granted leave to present a surrebuttal. Dr. Newton was again called to the witness stand. She testified that the DSM-IV was not the "ultimate" means of classifying illnesses because there "was some debate on whether the DSM-IV [was] a compromised document." Dr. Newton testified that there were two schools of though on the DSM-IV. One school believe that the manual was "too rigid because it does not take into account those varying aspects within the clinical practice of psychiatry." Dr. Newton testified that many insurance companies now utilized the International Classification of Disease (ICD-9-

CM) rather than the DSM-IV. Dr. Newton however conceded that the DSM-IV was "used most frequently and most and frequently referred to *** set standards for treatment within the psychiatric community." Dr. Newton then testified that there were portions of her diagnosis that "concur" with the DSM-IV and that there were portions of her diagnosis that were "more likely related to neurological disorders as opposed to psychiatric disorders in and of themselves"; thus, she explained that those portions of her diagnosis would not appear in the DSM-IV. Dr. Newton also testified that an EEG did not detect all electrical disturbances in the human brain and that an "awake EEG" is used "primarily to determine whether someone has a major disorder or not or epileptic disorder or not." Dr. Newton testified that the only way to rule out an electrical dysfunction would be to perform an "[a]sleep EEG with nasal pharyngeal leads."

On cross-examination, Dr. Newton testified that the EEG that was performed on defendant was performed by her order, but she testified that an "asleep EEG" was never conducted although she had requested such a test. However, Dr. Newton testified that she did not need an "asleep EEG" to reach her conclusion that defendant was insane at the time of the stabbing because the "EEG was to determine whether or not he had epilepsy or whether or not he had an irritable *fossae* in the brain as a result of that."

### E. The Trial Court's Findings

Subsequent to closing arguments, the trial court found defendant sane at the time of Naomi's death and found defendant guilty but mentally ill of first-degree murder. The trial court noted that the State and defendant presented expert testimony regarding defendant's sanity "[a]nd the two experts have a disagreement on the ultimate conclusion

as to whether or not [defendant] was insane at the time" of the offense. The court found that Dr. Newton "found post-traumatic disorder, episodic psychiatric features to the major depression, postconcussion syndrome as being what I would interpret as serious mental diseases rather than mental defects." The trial court then found that Dr. Echevarria "did not find any evidence to support a diagnosis of post-traumatic stress disorder using the standards that have been put forth in the DSM-IV," which "is certainly one of the most significant standard evaluating tools used in the psychiatric and psychological profession[s]." The court found that Dr. Newton was impeached because "[t]he credibility of the doctor is certainly subject to question when she has not used the correct legal standard in her – certainly in her report, acknowledging in her testimony as to what the definition of insanity is in Illinois." The court also found that it "was telling" that postconcussion syndrome was not recognized in the DSM-IV. The court also found that Dr. Newton's conclusion that Naomi's scratching of defendant's face triggered hypoxia was not likely. From the defendant's videotaped statement hours after Naomi's death, the court found defendant's scratches "superficial" and not of such a nature that would "trigger some type of complete alteration in one's brain function subject to all of a sudden rendering them insane for any behavior that then took place." Further, the court found that Naomi's reaction to defendant's suicide threat caused him to become "very angry," which led "to this violent outburst where he repeatedly stabbed and killed [Naomi]." As noted the trial court sentenced defendant to 30 years in the Illinois Department of Corrections. This appeal followed.

## II. ANALYSIS

20

On appeal, defendant first argues that the trial court's finding that defendant was not insane at the time of Naomi's slaying and was against the manifest weight of the evidence.

Section 6-2 of the Illinois Criminal Code of 1961 (Code) provides:

> "(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct."

720 ILCS 5/6-2(a) (West 2004).

All defendants are presumed sane and a defendant must prove by clear and convincing evidence that he was not guilty by reason of insanity.  720 ILCS 5/6-2(e) (West 2004).  When a defendant raises the affirmative defense of insanity, the State is not required to prove beyond a reasonable doubt that defendant was not insane at the time of the offense.  720 ILCS 5/6-2(e) (West 2004).  Rather, defendant bears the burden of proof, and "the existence of 'mental illness,' as defined in section 6-2 [of the Code], is a question of fact."  *People v. Urdiales*, 225 Ill. 2d 354, 428 (2007).  The trial court's sanity determination will not be overturned unless it is contrary to the manifest weight of the evidence.  *Urdiales*, 225 Ill. 2d at 427.  Moreover, because the trier of fact determines the weight to be given to testimony, witness credibility and the reasonable inferences to be drawn from the testimony, and resolves any inconsistencies or conflicts in the evidence, a reviewing court will not substitute its judgment for that of the trier of fact.  *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006).

A defendant who fails to meet his burden in establishing his legal insanity at the time of the commission of a criminal offense may be found guilty but mentally ill if the defendant was suffering from a mental illness at the time of the offense. 720 ILCS 5/6-2(c) (West 2004). However, a defendant found guilty but mentally ill is not absolved of criminal responsibility, and a court may sentence defendant to any sentence that may have been imposed upon a defendant convicted of the same offense without a finding of mental illness. 720 ILCS 5/6-2(c) (West 2004); *People v. Johnson*, 146 Ill. 2d 109, 131-32 (1991). A defendant found guilty but mentally ill "is no less guilty than one who is [found] guilty and not mentally ill." *People v. Crews*, 122 Ill. 2d 266, 278 (1998). The only difference that exists between the two verdicts is that upon a finding of guilty but mentally ill, the Illinois Department of Corrections must "cause periodic inquiry and examination to be made concerning the nature, extent, continuance, and treatment of the defendant's mental illness." 730 ILCS 5/5-2-6(b) (West 2004); *People v. Lantz*, 186 Ill. 2d 243, 253 (1999). Additionally, the Illinois Department of Corrections must provide "such psychiatric, psychological, or other counseling and treatment for the defendant as it determines necessary." 730 ILCS 5/5-2-6(b) (West 2004).

In the case at bar, the parties presented respective expert testimony regarding defendant's sanity. As noted, Dr. Newton was called by the defense and testified that defendant was insane at the time of Naomi's slaying and Dr. Echevarria was called by the State to rebut defendant's insanity defense.

As noted, Dr. Newton diagnosed defendant with posttraumatic stress disorder and post-concussion syndrome. Dr. Newton found that defendant was legally insane at the

22

time of Naomi's slaying and opined that defendant would not have been able to understand the seriousness of his actions and that he would not have been able to comport his conduct to the law. Dr. Echevarria testified that his psychiatric opinion was that defendant was legally sane at the time of the offense and that there was no evidence to support Dr. Newton's diagnosis of posttraumatic stress disorder. Further, Dr. Echevarria testified that he "never heard" of postconcussion syndrome and that such an illness was not recognized by the DSM-IV.

As the central issue at trial was the conflicting expert testimony, it was in the unique province of the trial court, as the trier of fact, to determine which expert it would regard as more credible and worthy of belief. *People v. Roper*, 116 Ill. App. 3d 821, 824 (1983). Further, because the weight given to an expert's opinion is measured by the stated reasons and the factual details supporting the conclusion, the trial court was "free to accept one expert's testimony over another's" and decide the "weight to accord the experts' respective testimony." *People v. Cundiff*, 322 Ill. App. 3d 426, 433 (2001).

As noted, in finding the defendant sane at the time of Naomi's death, the trial court noted that the State and defendant presented expert testimony regarding defendant's sanity "[a]nd the two experts have a disagreement on the ultimate conclusion as to whether or not [defendant] was insane at the time" of the offense. The court found that Dr. Newton "found post-traumatic disorder, episodic psychiatric features to the major depression, post-concussion syndrome as being what I would interpret as serious mental diseases rather than mental defects." The trial court then found that Dr. Echevarria "did not find any evidence to support a diagnosis of post-traumatic stress disorder using the

23

standards that have been put forth in the DSM-IV," which "is certainly one of the most significant standard evaluating tools used in the psychiatric and psychological profession[s]." The court found that Dr. Newton was impeached because "[t]he credibility of the doctor is certainly subject to question when she has not used the correct legal standard in her – certainly in her report, acknowledging in her testimony as to what the definition of insanity is in Illinois." The court also found that it "was telling" that postconcussion syndrome was not recognized in the DSM-IV. The court also found that Dr. Newton's conclusion that Naomi's act of scratching defendant's face triggered hypoxia in defendant was not likely. From the defendant's videotaped statement hours after Naomi's death, the court found defendant's scratches "superficial" and not of such a nature that would "trigger some type of complete alteration in one's brain function subject to all of a sudden rendering them insane for any behavior that then took place." Further, the court found that Naomi's reaction to defendant's suicide threat caused him to become "very angry," which led "to this violent outburst where he repeatedly stabbed and killed [Naomi]." Based upon the trial court's determination that Dr. Echevarria's testimony was more credible than the testimony of Dr. Newton, this court cannot say that the trial court's finding that defendant was sane at the time of Naomi's death was against the manifest weight of the evidence.

Furthermore, other evidence at trial, not specifically noted in the trial court's ruling, supports the finding that defendant was sane at the time of the offense. Defendant possessed the mental faculties to transport two steak knives in his backpack when traveling to Naomi's home to speak with her on October 17, 2003. He possessed the

mental faculties to flee when Naomi's mother opened the door of her home and found defendant standing over her daughter. He possessed the mental faculties to discard of the murder weapon, which was never recovered.

Despite the foregoing, defendant argues that the trial court erred by discounting Dr. Newton's testimony. Defendant argues that the trial court wrongfully discounted Dr. Newton's testimony because she did not "parrot" the statutory language defining "insanity" found in section 6-2 of the Code. 720 ILCS 5/6-2(a) (West 2004). In support of his argument for reversal defendant cites *People v. Dwight*, 368 Ill. App. 3d 873 (2006), where this court stated:

> "We find no authority to support the proposition that a defense
>
> witness has to say the defendant, due to mental illness or disease, lacked
>
> the substantial capacity to appreciate the criminality of his conduct when
>
> he committed the offense." *Dwight*, 368 Ill. App. 3d at 880.

The issue in *Dwight* was whether a defendant was entitled to a jury instruction regarding "insanity" based on a combination of lay and expert testimony. The trial court in *Dwight* rejected the defendant's request for the "insanity" instruction. On appeal, the State argued that the defendant failed to meet his burden to support an "insanity" instruction because no witness at trial testified that "at the time of the offense defendant lacked [the] substantial capacity to appreciate the criminality of his conduct." *Dwight*, 368 Ill. App. 3d at 880. In reversing, this court held that a defendant is entitled to a jury instruction regarding "insanity" if the evidence at trial warrants the instruction despite the fact that no witness at trial used the statutory language regarding insanity. *Dwight*, 368 Ill. App.

25

3d at 880. The case at bar, does not involve the question of whether defendant was entitled to a jury instruction. Rather, it involves whether the trial court's finding that defendant was not insane at the time of the criminal conduct was against the manifest weight of the evidence. The trial court in the case at bar was aware of the Illinois definition of "insanity," weighed the respective expert testimony, and found that defendant was not insane at the time of the instant offense. As we have already noted, this court cannot say that the trial court's finding with regard to defendant's sanity at the time of the offense was against the manifest weight of the evidence.

Defendant then contends that he is entitled to a new trial because he received ineffective assistance of counsel. Specifically, defendant argues that his trial counsel was ineffective because counsel failed to file a timely motion to suppress his postarrest inculpatory statements, failed to consult with defendant in advance of trial regarding defendant's right to testify, and proceeded to trial without the benefit of an asleep EEG, which was necessary for a proper presentation of Dr. Newton's testimony. Finally, defendant contends that the cumulative effects of trial counsel's errors deprived him of a fair trial.

We begin by reiterating the oft-cited principles related to a defendant's claim of ineffective assistance of counsel. "To prevail on a claim of ineffective assistance of counsel, a defendant must show that his attorney committed such serious errors as to fall beyond an objective standard of reasonableness, and that, without those objectively unreasonable errors, there was a reasonable probability that his trial would have resulted differently." This is a two-prong test. *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007),

26

No. 1-07-3362

citing *Strickland v. Washington*, 466 U.S. 668, 687-94, 80 L. Ed. 2d 674, 693-98, 104 S. Ct. 2052, 2064-68 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). "In *Strickland*, the United States Supreme Court delineated the two-prong test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the *sixth amendment*." (Emphasis added.) *People v. Bell*, 373 Ill. App. 3d 811, 821 (2007). "Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant." *Bell*, 373 Ill. App. 3d at 821, citing *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Our Illinois Supreme Court has stated that to demonstrate performance deficiency, a defendant must establish that counsel's performance was below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding[s] would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

As noted, defendant's first contention under *Strickland* is that defense counsel was ineffective for failing to file a motion to suppress his postarrest inculpatory statements prior to trial. In order to prevail on his claims, defendant bears the burden of showing that the motion to suppress would have probably been granted if made prior to trial (*People v. Bennett*, 222 Ill. App. 3d 188, 201 (1991)) and that the trial outcome would have been different if the evidence had been suppressed (*Bennett*, 222 Ill. App. 3d

27

at 203). Moreover, defense counsel is not required to present losing motions in order to provide effective legal assistance. *People v. McCarthy*, 213 Ill. App. 3d 873, 886 (1991).

We first address the issue regarding the timing of the motion to suppress defendant's inculpatory statements made subsequent to his arrest. Section 114-11 of the Illinois Code of Criminal Procedure of 1963, entitled "Motion to Suppress Confession," provides:

>"(a) Prior to the trial of any criminal case a defendant may move to suppress as evidence any confession given by him on the ground that it was not voluntary.
>
>(b) The motion shall be in writing and state facts showing wherein the confession is involuntary.
>
>(c) If the allegations of the motion state facts which, if true, show that the confession was not voluntarily made the court shall conduct a hearing into the merits of the motion.
>
>* * *
>
>(g) The motion shall be made before trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion." 725 ILCS 5/114-11(a), (b), (c), (g) (West 2004).

This statute clearly sets forth that the appropriate time for filing motions to suppress is prior to trial, unless the circumstances indicate that the subsection (g) exception should apply.

28

As noted, defense counsel, for the first time, sought leave to file a motion to suppress defendant's inculpatory statements on the first day of trial. Defense counsel stated that filing the motion was a matter of "housekeeping." After a short recess, the defense answered ready for trial, and no motion to suppress defendant's postarrest statements was filed. Per the foregoing, it is clear that if the defense were to file a motion to suppress defendant's postarrest statements, that motion should have been filed in advance of trial.

However, our analysis pertaining to defendant's ineffective assistance claim does not end here. As noted, defendant must still demonstrate that the motion to suppress probably would have been granted if made (*People v. Bennett*, 222 Ill. App. 3d 188, 201 (1991)) and that the trial outcome would have been different if the evidence had been suppressed (*Bennett*, 222 Ill. App. 3d at 203). We now proceed to those considerations.

Defendant argues that his trial counsel should have filed a motion to suppress his post-arrest statements because it is unclear from the record of the case at bar that defendant had the mental capabilities to understand his *Miranda* rights.

The State initially argues that defendant suffered no prejudice by defense counsel's decision not to file a motion to suppress because his identity as Naomi's killer was never in doubt; as defendant asserted the affirmative defense of insanity, he admitted that he committed the acts charged. We reject the categorical assertion offered by the State. It is clear under Illinois law that a defendant may both, as defendant did here, assert the affirmative defense of insanity and deny that he committed the acts charged by

pleading not guilty and simultaneously asserting the insanity defense. See *People v. Ford*, 39 Ill. 2d 318 (1968), and *People v. Moore*, 147 Ill. App. 3d 881, 885 (1986).

However, we do agree with the State's contention that even had the motion to suppress defendant's post-arrest statement been filed, it would not have probably been granted. As noted, prior to trial, the court ordered a BCX to determine defendant's fitness to stand trial, defendant's ability to understand *Miranda*, and defendant's sanity. The results of the BCX were that defendant was fit to stand trial, did possess the mental capabilities to understand *Miranda*, and was sane at the time of the administration of the BCX. Per the results of the BCX, which determined that defendant possessed the capabilities to understand *Miranda*, we find that the motion to suppress defendant's postarrest statements would not have probably been granted had the motion to suppress been made.

We also note that defendant consented to have his postarrest statements memorialized on videotape. As noted, the videotape was played in open court, but is not included in the record of this case. It is well settled that it is defendant's burden to prepare a complete record for appellate review. *Midstate Siding & Window Co. v. Rogers*, 204 Ill. 2d 314, 319 (2003). We can only presume that defendant was given and acknowledged his *Miranda* warnings before providing his videotaped statement. If there was evidence contained in the videotape that defendant was unable to understand his *Miranda* warnings, it is not before this court. Any doubts arising from the incompleteness of the record must be construed against defendant. *Rogers*, 204 Ill. 2d at 319.

Defendant then argues that he was denied the effective assistance of counsel because he was never given the opportunity to discuss the advantages and disadvantages of testifying on his own behalf with his trial counsel. As noted, after Dr. Newton's testimony, the defense rested its case-in-chief. The trial court admonished defendant regarding his right to testify. The trial court asked defendant whether he understood that he had a right to testify and defendant responded that he did know that he had such a right. The trial court then asked defendant whether he had discussed the possibility of him testifying with his attorney. After defendant responded that he had not discussed the matter with his attorney, the trial court again asked whether he knew he had a right to testify and defendant indicated that he did. Defendant then stated that it was his decision not to testify, that he had not been threatened, forced, or promised anything in exchange for not testifying, and that he desired to rest his case-in-chief. The record conclusively establishes that defendant's decision not to testify was informed, rational, and voluntary. *People v. Davis*, 373 Ill. App. 3d 351, 361 (2007). Furthermore, defendant offers no support from the record that the outcome of his trial would have differed had his attorney discussed testifying with him. As such, defendant cannot establish that he suffered any prejudice from counsel's failure, and his claim fails under the second *Strickland* prong.

Defendant then argues that he was denied the effective assistance of counsel because trial counsel proceeded to trial without the benefit of an asleep EEG, which was necessary for Dr. Newton's opinion that defendant was insane at the time of the instant offense. We find that this argument also fails under the second *Strickland* prong because defendant can demonstrate no prejudice as a result of defense counsel's decision to

31

proceed to trial without the benefit of an asleep EEG. The absence of the asleep EEG did not hinder defendant's presentation of Dr. Newton's testimony, because Dr. Newton testified that an asleep EEG was unnecessary to her opinion that defendant was insane at the time of the instant offense. Thus, even had the asleep EEG been performed, it would not have altered Dr. Newton's opinion.

Defendant then maintains that the cumulative effect of all of defense counsel's alleged errors deprived him of a fair trial. We find this argument unpersuasive. "The whole can be no greater than the sum of its parts" and defendant has failed to demonstrate anything warranting reversible error in the myriad of arguments offered to justify reversal for ineffective assistance of counsel. *People v. Albanese*, 102 Ill. 2d 54, 82-83 (1984). While it is true that trial errors may have a cumulative effect when considered together (*People v. Killian*, 42 Ill. App. 3d 596, 601 (1976)), defendant has failed to establish this in this case.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

WOLFSON and GARCIA, JJ., concur.

Please use the ]
following form:        ]
                      ]
                      ]        THE PEOPLE OF THE STATE OF ILLINOIS,
                      ]
                      ]                Plaintiff-Appellee,
                      ]            v.
                      ]
                      ]        PIERRE HOUSEWORTH,
                      ]
                      ]                Defendant-Appellant.
                      ]

Complete        ]
  TITLE         ]
of Case.        ]

| Docket No. ] | No. 1-07-3362 |
|---|---|
| | Appellate Court of Illinois |
| COURT ] | First District, First Division |
| | |
| | DECEMBER 22, 2008 |
| Opinion Filed ] | (Month, Day and Year) |

JUSTICES      ] PRESIDING JUSTICE ROBERT E. GORDON delivered the
              ] opinion of the court.

              ] WOLFSON and GARCIA, JJ., concur.

APPEAL from the    ] Lower Court and Trial Judge(s) in form indicated
Circuit Court ] in margin:
of Cook County;    ] Appeal from the Circuit Court of Cook County.
the Hon:_____     ]
Judge Presiding____] Honorable James M. Obbish, Judge Presiding.

For APPELLANTS   ] Indicate if attorney represents APPELLANTS or
John Doe of      ] APPELLEES and include attorneys of counsel.
Chicago.         ] Indicate the word NONE if not represented.
For APPELLEES,   ] -------------------------------------------------------------------------------
-
Smith and        ]        Allan A. Ackerman, Esq.
Smith, of        ]        Chicago, Illinois   60614
Chicago.         ]        Attorneys for Appellant
Brown,           ]        Attn: John C. Derscheid - Second Year Law Student, Chicago-Kent
of Counsel.      ]        College of Law, Chicago, Illinois   60601
                 ]        Assisted in the preparation of this opening brief.

Also add atty. ]
for third party  ]        Anita Alvarez - State's Attorney, County of Cook
appellants       ]        Chicago, Illinois   60602
or appellees.    ]        Attorneys for Appellee
                 ]        Attn: James E. Fitzgerald, Manny Magence and Omar Jaleel
                 ]            OF COUNSEL
                 ]
_____(USE REVERSE SIDE IF NEEDED_____