2020 IL App (1st) 181260-U

No. 1-18-1260

Order filed October 28, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 07CR14512 |
| | ) | |
| BELTON SMITH, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Howse and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We affirm the circuit court's dismissal of defendant's *pro se* postconviction petition where defendant failed to show that his trial counsel's performance was arguably deficient or that he was arguably prejudiced by trial counsel's performance.

¶ 2     Defendant Belton Smith appeals from an order of the circuit court of Cook County summarily dismissing his *pro se* petition for relief under the Post-Conviction Hearing Act (Act) (725 ILSC 5/122-1 *et seq.* (West 2016)). On appeal, defendant contends that the court erred in summarily dismissing his petition where the allegations in his petition and the affidavits attached

thereto presented a cognizable claim that his trial counsel arguably provided ineffective assistance in failing to impeach the State's expert witness with evidence that the expert's psychiatric evaluation interview with defendant was significantly shorter than his testimony suggested. Defendant asserts that there was no strategic reason for his trial counsel to not impeach the State's expert witnesses with this evidence and that the impeachment of the expert witness would have undermined his conclusions regarding defendant's sanity at the time of the offense. Defendant asserts that where his sanity was the subject of a "battle of the experts," trial counsel's failure to impeach the State's expert witness represented arguably deficient performance and arguably prejudiced him. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4                                       A. Trial

¶ 5      A full recitation of the facts from defendant's trial can be found in this court's order on defendant's direct appeal. *People v. Smith*, 2016 IL App (1st) 141442-U (unpublished order under Illinois Supreme Court Rule 23). As relevant here, defendant was convicted after a bench trial of aggravated criminal sexual assault and home invasion and sentenced to consecutive prison terms of 21 and 6 years. The evidence adduced at defendant's trial showed that in 2007, defendant's wife and two of his children were killed in a motor vehicle accident. Defendant survived without suffering significant injuries, but was prescribed Dilaudid, a powerful painkiller. About a month after the motor vehicle accident, defendant called a friend of the family, M.G., and asked if he could come over to M.G.'s home to show him something. When defendant entered M.G.'s home, defendant grabbed M.G. and attacked him. Defendant forced M.G. to the ground and ordered him to perform oral sex, threatening to kill him. M.G. performed oral sex on defendant and noticed that defendant was holding a camera. Afterwards, defendant demanded money from M.G. M.G. only

had a $2 bill, so defendant told M.G. to put on his wife's nightshirt so they could go to an ATM. Defendant led M.G. from his home, keeping a grip on him. Defendant and M.G. were approached by a neighbor, Joann Konstantopoulos. Konstantopoulos noted that defendant was leading M.G. by the arm and that M.G. was wearing a woman's nightshirt and was pale and disheveled with blood on his face. Defendant told Konstantopoulos that he was taking M.G. to the doctor. Defendant loosened his grip on M.G. and M.G. fled screaming "call the police." Konstantopoulos called M.G.'s wife and M.G. ran to a gas station where he called police. M.G. identified defendant as the assailant to responding officers and defendant was arrested. Police officers searched defendant's home where they discovered a camera under sheets in the laundry room and a $2 bill.

¶ 6    Prior to trial, the court ordered a behavioral clinical examination (BCX) of defendant's sanity. In September 2010, psychiatrist Dr. Monica Argumendo submitted a BCX report to the court stating that she examined defendant in August 2010 and found him legally sane at the time of the offense with "no indication that he suffered from a mental disease or defect which would have caused him to lack substantial capacity to appreciate the criminality of his conduct at that time." In March 2011, the court ordered a new BCX of defendant's sanity at defense counsel's request. In May 2011, psychiatrist Dr. Nishad Nadkarni submitted a BCX report to the court in which he stated that he examined defendant in April 2011 and found that he was legally sane at the time of the offense and "was not suffering from any mental disease or defect that would have substantially impaired his capacity to appreciate the criminality of the alleged act."

¶ 7    In June 2011, private counsel appeared for defendant and the public defender withdrew. Defendant's new counsel informed the court that he and defendant were working with psychologist Dr. Michael Stone. Dr. Stone submitted a report detailing his examinations and testing of defendant. In the report, Dr. Stone opined that defendant was under extreme emotional and

physical duress at the time of the incident and that he suffered from agitated depression and borderline personality disorder. Dr. Stone opined that the effects of strong opiate narcotics, such as Diluadid, would exacerbate defendant's condition. The report did not state, however, that at the time of the offense defendant was legally insane such that he could not appreciate the criminality of his actions. Dr. Stone later submitted an addendum to his psychological evaluation in which he opined that defendant had not fully processed or recovered from the loss of his family in the motor vehicle accident. Dr. Stone believed that defendant was in chronic pain and abusing his medications. Dr. Stone opined that defendant "combined Dilaudid with a cognac to the degree that he ended up in a state of extreme confusion and disorientation." Dr. Stone concluded that the "combined effect of all these vulnerabilities rendered him incapable of responsibility for his actions at the time of the alleged instant of offense."

¶ 8    The State filed a motion *in limine* seeking to bar defendant from raising the defense of voluntary or involuntary intoxication or drugged condition and preventing Dr. Stone from testifying that defendant's actions were result of intoxication. The court granted the motion *in limine* in part, finding that Dr. Stone could testify to defendant's mental state due to trauma, but not due to prescription drugs because, as a psychologist, he was not qualified to opine on the effect of drugs on one's mental state.

¶ 9    At trial, Dr. Stone testified that defendant was legally insane at the time of the offense because of a psychotic episode. Dr. Stone testified that defendant's sexual assault of M.G. was "bizarre" because it was not typical behavior for defendant. Dr. Stone testified that he based his conclusions on a three-hour interview of defendant, interviewing defendant's mother, and reviewing defendant's records. Dr. Stone testified that his opinion "here on this stand" at trial was that defendant's borderline personality disorder and agitated depression resulted in a psychotic

episode that rendered him unable to "conform his behavior due to the mental defect *** to the norms and requirements of the law." Dr. Stone acknowledged, however, that his report did not state that defendant suffered a mental disease or defect rendering him legally insane.

¶ 10    Dr. Nadkarni testified in rebuttal that he interviewed defendant for about an hour in 2011 after reviewing defendant's records including Dr. Argumendo's 2010 BCX report. Dr. Nadkarni testified that defendant denied any symptoms of any major mental illness and had no history of psychiatric treatment. Defendant told Dr. Nadkarni about the fatal motor vehicle accident, but did not mention any other source of trauma. In interviewing defendant, Dr. Nadkarni did not see any signs of psychiatric or cognitive impairment. In discussing the incident with M.G., defendant said that he was sad and angry due to the deaths in his family and that an argument arose with M.G., but he denied any sexual assault. Dr. Nadkarni noted that defendant had changed his account of the incident over time and confronted defendant with this fact testifying that this indicated that defendant was able to appreciate the criminality of his conduct. Dr. Nadkarni opined that defendant was not suffering from any major mental illness and thus never had a psychotic episode on the day in question. Dr. Nadkarni testified that defendant's behavior during the incident, including calling M.G. to ensure that he was home alone, bringing a camera to M.G.'s home, demanding money from M.G., and attempting to bring M.G. to an ATM, indicated organized rather than disorganized thinking. He characterized defendant's behavior as sadistic rather than bizarre. When asked about Dr. Stone's finding of stress and trauma, Dr. Nadkarni stated that such a conclusion was unwarranted.

¶ 11    In finding the defendant guilty, the court discussed Dr. Stone's testimony and Dr. Nadkarni's rebuttal. The court noted that the experts in this case were giving opinions on an incident that occurred several years "before they first ever saw the defendant." The court noted

that it had "great difficulty with Dr. Stone." The court found that as Dr. Stone testified "it was thoroughly clear he had not tendered an opinion which would have been valuable to this court prior to taking the stand. And once he got on the stand he then made the calculated opinion as to the defendant's insanity at the time these events are alleged to have occurred." The court observed that Dr. Stone spent "a considerable amount of time more than Dr. Nadkarni" with defendant, but nonetheless found that defendant was not insane at the time of the incident. The court therefore found defendant guilty on all counts.

¶ 12                          B. Direct Appeal

¶ 13    On direct appeal to this court, defendant's sole contention was that his trial counsel deprived him of the right of meaningful assistance of counsel under *United States v. Cronic*, 466 U.S. 648 (1984) by presenting the legally invalid defense of insanity. *Smith*, 2016 IL App (1st) 141442-U, ¶¶ 2, 32. This court found that defendant failed to raise a cognizable claim under *Cronic*, but did not address the merits of defendant's claim regarding trial counsel's performance. *Id.* ¶¶ 35, 36.

¶ 14                       C. Postconviction Petition

¶ 15    On January 17, 2018, defendant filed a *pro se* petition under the Act alleging, *inter alia*, that the State's expert witness, Dr. Nadkarni, testified falsely at his trial. Specifically, defendant asserted that he never told Dr. Nadkarni about the accident that resulted in the death of his wife and children. He also asserted that Dr. Nadkarni spoke to him for only 17 minutes and asked him only about his health and current mindset. Defendant contended that he informed his trial counsel about Dr. Nadkarni's false testimony and urged him to obtain the sign in sheet from the Cook County Jail, but counsel failed to do so or "even attempt to make examination adversarial." Defendant attached an affidavit to his petition from Kimberly Mascarenas, defendant's girlfriend.

In the affidavit, Mascarenas averred that she asked defendant's trial counsel to obtain the "log book" from the Cook County Jail for the date and time that defendant was evaluated by Dr. Nadkarni. Defendant's trial counsel responded that he would not be able to help defendant anymore because defendant owed him $2,000.

¶ 16    In dismissing defendant's petition, the circuit court found that defendant failed to allege that the State knowingly presented false testimony regarding the amount of time that Dr. Nadkarni spent with defendant. As such, the court found that defendant failed to state a cognizable claim under the act. The court further found that the petition lacked information to show that defendant's allegations could be corroborated. The court noted that defendant mentioned a sign in sheet and Mascarenas's affidavit mentioned a jail "log book," but defendant failed to attach any such records to his petition. The court also determined that Dr. Nadkarni's testimony "did not seem significant to the verdict." The court noted that the trial court discounted both testimony of both experts because they both evaluated defendant years after the offense. The court also noted that the trial court's comments about Dr. Stone's testimony suggested that Dr. Nadkarni's rebuttal testimony was not critical to the outcome of the case where it was defendant's burden to prove by clear and convincing evidence that he was not guilty by reason of insanity. The court further noted that Dr. Nadkarni's opinion that defendant's actions during the offense indicated organized thinking did not depend on an in-person examination of defendant. The court therefore found that defendant had failed to show that his trial counsel arguably provided unreasonable assistance and for the same reasons found that defendant failed to show that he was arguably prejudiced by his counsel's failure to impeach Dr. Nadkarni regarding the length of the evaluation. Defendant now appeals.

¶ 17                                    II. ANALYSIS

¶ 18    On appeal, defendant contends that the court erred in summarily dismissing his petition where his claim of trial counsel's ineffective assistance, supported by an affidavit from Mascarenas, was sufficient to show an arguable violation of the test set forth in *Strickland v. Washington*, 466 U.S. 668, (1984) for evaluating his counsel's performance. Defendant asserts that if trial counsel had impeached Dr. Nadkarni with the jail sign-in sheet as defendant requested, such impeachment would have contradicted Dr. Nadkarni's testimony about the length, and therefore the substance, of his interview with defendant. Defendant asserts that the validity of his insanity defense was based on the conclusions of two experts with diametrically opposed opinions and their credibility was critical to the outcome of the case. Defendant maintains that therefore trial counsel's failure to impeach Dr. Nadkarni with the information in the jail sign-in sheet arguably prejudiced him and there was no strategic reason for trial counsel to not impeach Dr. Nadkarni with this information.

¶ 19                          A. The Post-Conviction Hearing Act

¶ 20    As an initial matter, we note that the Act provides a three-stage mechanism by which a criminal defendant may assert that his conviction was the result of a substantial denial of his constitutional rights. 725 ILCS 5/122-1 (West 2016); *People v. Delton*, 227 Ill. 2d 247, 253 (2008). At the first stage of proceedings, as here, defendant is required to set forth only the "gist" of a constitutional claim, and the circuit court may summarily dismiss the petition if it finds that the petition is frivolous or patently without merit, *i.e.*, that it has no arguable basis in law or fact. *People v. Hodges*, 234 Ill. 2d 1, 9, 16 (2009). Normally, claims of ineffective assistance of counsel are analyzed under the standard set forth in *Strickland*. *Id.* at 17. Under that standard, a defendant must show both that counsel's performance "fell below an objective standard of reasonableness" and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88. At the

first stage of postconviction proceedings, however, a defendant need show only that it "arguable" that his claim has merit. *People v. Tate*, 2012 IL 112214, ¶ 20. As such, the supreme court has recognized that "[a]t the first stage of postconviction proceedings under the Act, a petition alleging ineffective assistance may not be summarily dismissed if (i) it is *arguable* that counsel's performance fell below an objective standard of reasonableness and (ii) it is *arguable* that the defendant was prejudiced." (Emphases added.) *Hodges,* 234 Ill. 2d at 17. Thus, defendant need not demonstrate counsel's deficient performance at this stage, but must merely show that it is arguable that counsel's performance was deficient. *Tate*, 2012 IL 112214, ¶¶ 19-20. Accordingly, we will assess whether defendant's claim has met this arguable *Strickland* standard (*Hodges,* 234 Ill. 2d at 17) and we review the summary dismissal of a postconviction petition *de novo* (*Tate*, 2012 IL 112214, ¶ 10).

¶ 21                    B. Trial Counsel's Failure to Impeach

¶ 22    Here, defendant contends that he demonstrated that it is at least arguable that he was prejudiced by trial counsel's unreasonable performance. Defendant asserts that impeaching Dr. Nadkarni with the information in the jail sign-in sheet would have undermined Dr. Nadkarni's credibility by showing that he misrepresented the amount of time that he spent evaluating defendant. Defendant asserts that impeaching Dr. Nadkarni with the sign-in sheet would have also weakened his conclusions about defendant's sanity because it would have been "impossible" for Dr. Nadkarni to evaluate defendant in such a short amount of time. We find defendant has failed to show that trial counsel's performance was arguably deficient or that he was arguably prejudiced by trial counsel's performance.

¶ 23    First, defendant has failed to show that it is arguable that the trial court's ruling on defendant's insanity defense would have been different if trial counsel had impeached Dr.

Nadkarni as defendant suggests. A review of the trial court's comments on defendant's insanity defense show that the court did not even mention Dr. Nadkarni's testimony, except to note that Dr. Stone spent more time evaluating defendant than Dr. Nadkarni did. Instead, the court focused on the deficiencies in Dr. Stone's testimony and his report. The court noted that Dr. Stone first evaluated defendant years after the incident. The court then stated that it had "great difficulty with Dr. Stone" because Dr. Stone did not render an opinion on defendant's sanity in his report, but then at trial made a "calculated opinion" as to defendant's sanity at the time of the incident.

¶ 24    These comments by the court highlight that it was defendant's burden to establish his insanity defense. *People v. Houseworth*, 388 Ill. App. 3d 37, 50 (2008) (citing *People v. Urdiales*, 225 Ill. 2d 354, 428 (2007)). Although defendant points out that Dr. Nadkarni testified that he was "very, very disturbed by Dr. Stone's report" because he had rarely seen a report draw "psychiatric conclusions[] off of something that has absolutely no correlation with the known data" there is no indication that the trial court relied on that testimony in rejecting defendant's insanity defense. Instead, the court simply found that Dr. Stone's testimony, in combination with his report, failed to sufficiently establish defendant's insanity at the time of the offense. As noted, the court's conclusion appeared to be based on Dr. Stone's failure to draw a conclusion about defendant's sanity in his report, in contrast to his unequivocal testimony at trial that defendant was not sane at the time of the offense. Defendant has failed to show how impeaching Dr. Nadkarni with the alleged information on the sign-in sheet would have served to cure the deficiencies the court found in Dr. Stone's testimony and report.

¶ 25    In addition, defendant has failed to show that even if trial counsel had confronted Dr. Nadkarni with the sign-in sheet showing he spent only 17 minutes with defendant rather than one hour as he testified, that such impeachment would have undermined Dr. Nadkarni's assessment

and arguably changed the result of his trial. Dr. Nadkarni testified that he based his evaluation of defendant not only on his in-person interview with him, but also on a review of defendant's records, which included Dr. Argumendo's BCX report where she likewise found defendant sane at the time of the incident. Dr. Nadkarni also reviewed police reports from the incident, defendant's medical records following the fatal motor vehicle accident, and his medical records from 2007 to 2010 at Cermak Health Services. Furthermore, even though the sign-in sheet may have shown that Dr. Nadkarni interviewed defendant for only 17 minutes as defendant suggests, it would say nothing regarding the content of their interview. Dr. Nadkarni testified that he discussed with defendant the fatal motor vehicle accident, the incident with M.G., and defendant's psychiatric and medical history. Dr. Nadkarni noted both in his trial testimony and his report that defendant did not have any signs of psychiatric or cognitive impairment and was not suffering from a major mental illness. Defendant fails to suggest that Dr. Nadkarni could not have reached these same conclusions even if his interview with defendant were shorter than he testified to given that the conclusions were also based on defendant's medical record, police reports, and psychiatric history.

¶ 26    Indeed, there is no suggestion in the record that the trial court's assessment of Dr. Nadkarni's or Dr. Stone's opinions would be altered in any way by trial counsel presenting evidence that Dr. Nadkarni spent less time with defendant than he stated. The record shows that the trial court was already aware that Dr. Stone spent more time interviewing defendant than Dr. Nadkarni did. In issuing its judgment, the trial court observed that Dr. Stone spent "a considerable amount of time more than Dr. Nadkarni" with defendant. This fact, however, did not seem to affect the trial court's conclusion that defendant had failed to meet his burden on his insanity defense. This once again emphasized that it was defendant's burden to establish his insanity defense and the trial court's rejection of that defense was based on the deficiencies it found with Dr. Stone's

testimony and reports, rather than on Dr. Nadkarni's rebuttal testimony. The proposed impeachment of Dr. Nadkarni may have served to undermine his credibility, but it would not have bolstered Dr. Stone's testimony and thus defendant's insanity defense and therefore would not have arguably changed the result of his trial. Defendant has thus failed to show that is arguable that the result of his trial would have been different if trial counsel had impeached Dr. Nadkarni with the alleged information concerning the length on the interview. Accordingly, we find that the court did not err in summarily dismissing his *pro se* petition under the Act.

¶ 27                                III. CONCLUSION

¶ 28     For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 29     Affirmed.