SECOND DIVISION
November 21, 2006

No. 1-05-1898

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
|     Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
|       v. | ) | |
| | ) | |
| MARCUS DWIGHT, | ) | Honorable |
| | ) | Paul J. Nealis, |
|     Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE WOLFSON delivered the opinion of the court:

The jury heard evidence that on November 20, 2000, the defendant Marcus Dwight robbed Bertha Gonzalez at gunpoint. He took her cell phone, phone charger, and work identification card. The jury found the defendant guilty of armed robbery and the trial court sentenced him to 10 years in prison. Dwight does not deny he committed the armed robbery. The issues he raises in this appeal have to do with the trial court's refusal to instruct the jury on the defense of insanity.

We find the instructions should have been given. For that reason, we reverse the defendant's conviction and remand this cause for a new trial.

FACTS

### Voir Dire

Before jury selection defense counsel requested that the

trial judge ask potential jury members whether they had any history or experience in their families of psychological illness or treatment. Defense counsel agreed to two follow-up questions suggested by the trial judge: (1) "would that influence your opinion one way or the other as to any testimony that you may receive from a psychiatrist or a psychologist?" and (2) "the Defense in this case is raising the issue of insanity; would that pose any problems?" The State requested the following question: "Do You believe that a person can have a mental illness or disorder and still be guilty of a crime as charged?" Defense counsel told the court he had no objection to the State's question. The judge asked the question of every juror impaneled. The judge never asked jurors if the insanity defense would pose any problems for them, but he did ask the other question proposed by defense counsel.

## Trial Testimony

At trial, Bertha Gonzalez testified that on November 20, 2000, she was sitting in her parked van when a red car pulled up alongside her car and parked. Defendant got out of the car, approached her van, and stood next to the driver's side window. She rolled down the window about four inches. Defendant asked her where 13th Street was, and she told him. Defendant looked around inside her car. He said, "Ma'am, I don't want to hurt

you, but I want you to give me something." Gonzalez said, "What?" Defendant repeated the statement. Gonzalez said, "Well, what do you want?" Gonzalez asked defendant if he wanted an Avon book, and he said no. Defendant then asked Gonzalez to be his girlfriend and asked her to engage in a sex act. Gonzalez said no. Defendant said he didn't want to hurt her, but that he had a gun. He then pulled a gun from his pocket. He pointed the gun at Gonzalez and held it so that only she could see it.

Defendant said he didn't want to hurt her and asked her for her cell phone. She gave the phone to him. Defendant then asked for her cell phone charger. She gave him the charger. Defendant then asked her for her picture time card, which she used for work. The card was visible underneath the radio. Gonzalez told defendant the card was not a credit card but a time card. He said he just wanted something with her picture on it. She gave him the card. Defendant then said he wanted a kiss. Gonzalez told him no. Defendant left.

Gonzalez also testified that after giving defendant directions he said, "What do you have for me?" She asked him what he meant. He asked her if she had any money, and she said she didn't have any. She said the defendant did not take her purse or credit cards. Her purse was next to her and not in view of the defendant.

Gonzalez reported the crime to the police and identified defendant in a photo array and a lineup. The State introduced evidence that a fingerprint impression taken from Gonzalez's car window matched defendant's fingerprint samples.

Shalonda Dwight, defendant's wife, testified that at the time of the offense she was dating the defendant and saw him on a daily basis. In October 2000, she noticed changes in defendant's demeanor and temperament that lasted for a couple months. He became very paranoid, anxious, and frantic. He spoke loudly and cursed frequently. Before that time, he was laid-back and relaxed. Defendant exhibited paranoia by looking out the windows and asking who was on the phone or at the door. Defendant was not sleeping at night. Sometimes at night he would go outside and watch TV in the car. He usually was a neat and clean person, but his appearance changed.

Annie Dwight, defendant's mother, testified defendant exhibited significant changes in his behavior in October 2000. He seemed very depressed. He told her he needed to see a doctor. He was sleeping only one or two hours a night for three or four days at a time. He was playing loud music, drinking, and waking up the neighbors at 3 a.m. He became very paranoid. He told his parents the FBI was trying to kill him. He thought the sound of a car backfiring was the CIA shooting at him. He told his

4

parents he was God and hit his bedroom door with his fist until his fist bled.

The State made a motion to exclude Dr. James Corcoran, a forensic psychiatrist, from testifying because he could not opine whether defendant was insane at the time of the offense. Defense counsel told the court Dr. Corcoran would testify that it was more likely than not the defendant was insane at the time of the offense. The court allowed Dr. Corcoran to testify but reserved its ruling on the insanity instruction until after trial.

Dr. Corcoran testified he evaluated the defendant on June 1, 2003, and June 16, 2004. Dr. Corcoran said defendant's symptoms as reported by defendant's girlfriend and mother were consistent with bipolar or manic depressive illness. The description of the offense in the police report contributed to Dr. Corcoran's diagnosis because hypersexuality is a common symptom of an unmedicated bipolar disorder.

On October 26, 2000, the defendant's mother took him to see Dr. Ruben Nichols. He saw Dr. Nichols again on November 3 and November 9, 2000. Dr. Nichols diagnosed defendant with situational anxiety and put him on a work restriction. Dr. Nichols referred him to Dr. Love, a psychiatrist. Dr. Love evaluated the defendant on four occasions in January and February 2001. Dr. Love stated defendant was displaying a progressively

5

depressed mood, agitation, an angry, hostile affect, and paranoid delusional thinking. Dr. Love diagnosed defendant with paranoid delusional disorder and major depression with recurrent psychotic features. The defendant declined anti-psychotic medication and a referral for inpatient treatment.

The defendant told Dr. Corcoran he was unable to recall the incident of November 20, 2000. He recalled being told by his mother that he had a court date in Indiana and driving around in his car. He remembered receiving a call that the police were looking for him, but he did not know why. Dr. Corcoran said a person with unmedicated bipolar disorder may have memory problems because of racing thoughts. Dr. Corcoran believed defendant created an alibi or was malingering in his report to Dr. Henry. The defendant also may have been experiencing a residual paranoia even though he was on medication at that time.

Dr. Corcoran concluded defendant was suffering from bipolar effective disorder, a severe psychiatric illness, at the time of the offense. He said he could not give a formal opinion regarding whether defendant was legally insane at the time of the crime because the defendant could not say what was going on in his mind at the time of the incident. Dr. Corcoran could not state an opinion on defendant's sanity to a reasonable degree of medical and scientific certainty.

6

On cross-examination, Dr. Corcoran testified he had read Dr. Henry's report in which defendant described in detail his activities on November 20, 2000. The State read the report to the jury, but the report was not admitted into evidence.

The State called Dr. Jonathan Kelly, a psychiatrist employed by Forensic Clinical Services for the Circuit Court of Cook County, as a rebuttal witness. Dr. Kelly said he interviewed the defendant on June 1, 2004. He took over the case from Dr. Henry. The defendant told Dr. Kelly he did not recall what happened on November 20, 2000, or what had happened during the two prior months. However, defendant's answers to some questions showed he had some memory. Dr. Kelly said the most logical explanation was that defendant was malingering, i.e., fabricating a psychological or physical symptom to avoid criminal prosecution. Dr. Kelly did not observe any medical or psychiatric reason that would explain the memory loss. He diagnosed defendant with bipolar disorder, in remission with medications, and a history of alcohol and cannabis abuse.

Dr. Kelly said a person may have bipolar disorder but not be legally insane. He said most people with bipolar disorder do not commit criminal offenses. Dr. Kelly's opinion, within a reasonable degree of medical and psychiatric certainty, was that defendant was legally sane at the time of the offense. The

following factors supported his opinion: (1) defendant had no psychotic symptoms at the time of the offense that prevented him from knowing what he was doing was wrong; (2) he had a non-psychotic motive for the crime--obtaining money or possessions from the victim; (3) the criminal behavior was goal-oriented, organized and not bizarre; (4) the behavior reflected prior planning in that defendant was armed with a handgun; (5) defendant pointed a gun at the victim while demanding money, showing criminal intent; (6) defendant's flight from the crime scene, failure to surrender himself to the police, and disposal of the gun showed knowledge of the wrongfulness of his conduct; (7) defendant did not require psychiatric hospitalization at the time of the offense; and (8) at the time of the offense, defendant was not homicidal or suicidal and was able to provide for his own physical needs.

On cross-examination, Dr. Kelly admitted defendant's mother's description of defendant's behavior in October and November 2000 was consistent with a manic episode, and the mother's reported observations could be seen as psychotic symptoms. He said defendant told him he had suicidal thoughts in October 2000 and had played Russian roulette by placing a gun to his head then shooting at the wall. Dr. Kelly said he did not think there was sufficient information to say defendant qualified

for a manic episode every day in October and November. In Dr. Kelly's interview with the defendant, the defendant "indicated he did not have symptoms, psychotic symptoms in particular, that interfered with his knowledge of what he was doing was wrong or against the law."

During the jury instructions conference, the court denied an insanity instructions. The court found, based on the evidence, no reasonable man could find the defendant was insane at the time of the offense. The court allowed an instruction and a verdict form for the jury to find defendant guilty but mentally ill.

The jury returned a general verdict of guilty and did not find defendant guilty but mentally ill. The court sentenced defendant to 10 years in prison.

DECISION

I. Insanity Instruction

Defendant contends he was denied a fair trial when the court refused his request for jury instructions on insanity. The trial court refused to allow the instructions because defendant had the "burden to prove by clear and convincing evidence that [he] was insane at the time of the offense and no such proof was presented as to that."

A defendant is legally insane under Illinois law if, "as a result of mental disease or mental defect, he lacks substantial

9

capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2004). The law presumes that all persons are sane. People v. Williams, 201 Ill. App. 3d 207, 558 N.E.2d 1258 (1990). But the presumption serves no useful purpose when the issue of a defendant's sanity is clearly raised. People v. Childs, 51 Ill. 2d 247, 256-58, 281 N.E.2d 631 (1972). It is the defendant's burden "to prove by clear and convincing evidence that the defendant is not guilty by reason of insanity." 720 ILCS 5/6-2(e) (West 2004).

Insanity is an affirmative defense. 720 ILCS 5/6-4 (West 2004). To raise any affirmative defense, the defendant must present "some evidence" of the defense. 720 ILCS 5/3-2(a) (West 2004). Courts have interpreted the "some evidence" standard to be "enough evidence so that, if believed, it would be sufficient for a reasonable jury to find in [the defendant's] favor." People v. Jordan, 247 Ill. App. 3d 75, 92, 616 N.E.2d 1265 (1993) (defense of justification); see also People v. Everette, 141 Ill. 2d 147, 157, 565 N.E.2d 1295 (1990) (self-defense), People v. Cord, 258 Ill. App. 3d 188, 192, 630 N.E.2d 173 (1994) (defense of necessity).

Courts consider the standard of proof when deciding whether an insanity instruction must be given. For example, in People v. Moore, the court held a defendant is entitled to instructions on

10

insanity "only if there is sufficient evidence to support a jury's finding of insanity by a preponderance of the evidence." 147 Ill. App. 3d 881, 886, 498 N.E.2d 701 (1986); see also People v. Williams, 235 Ill. App. 3d 638, 648, 601 N.E.2d 1070 (1992) ("[d]efendant is entitled to instructions on insanity only where a jury's finding of insanity would be supported by a preponderance of the evidence").  At the time Moore and Williams were decided, the standard of proof for an insanity defense was "preponderance of the evidence."  See Moore, 147 Ill. App. 3d at 884-85, citing Ill. Rev. Stat. 1983, ch. 38, pars. 3-2, 6-2. That standard changed before the events of this case took place. In 1995, the legislature changed a defendant's burden of proof for an insanity defense to "clear and convincing evidence."  720 ILCS 5/6-2 (e) (West 2004).

The federal statute defining the affirmative defense of insanity is very similar to the Illinois statute.  The Insanity Defense Reform Act of 1984 provides:

> "(a) Affirmative defense.--It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable

11

        to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

        (b) Burden of proof.--The Defendant has the burden of proving the defense of insanity by clear and convincing evidence." 18 U.S.C. § 17 (1984).

The United States Court of Appeals for the 11th Circuit held, under this insanity statute, "a federal criminal defendant is due a jury instruction on insanity when the evidence would allow a reasonable jury to find that insanity has been shown with convincing clarity." United States v. Owens, 854 F.2d 432, 435 (11th Cir. 1988). "The trial judge must construe the evidence most favorably to the defendant." Owens, 854 F.2d at 436.

In a determination of defendant's sanity, a trier of fact may reject all expert testimony and base its determination solely on lay testimony. People v. West, 231 Ill. App. 3d 646, 650-51, 596 N.E.2d 740 (1992). Of particular relevance are observations by lay witnesses made shortly before or after the crime was committed. West, 231 Ill. App. 3d at 651. Other relevant factors include the defendant's plan for the crime and methods to prevent detection. People v. Gilmore, 273 Ill. App. 3d 996,

1-05-1898

1000, 653 N.E.2d 58 (1995). A defendant's unusual behavior or bizarre or delusional statements do not compel a finding of insanity, and a defendant may suffer from a mental illness without being legally insane. Gilmore, 273 Ill. App. 3d at 1000.

The State contends the defendant did not meet his burden of presenting sufficient evidence for insanity instructions because no witness testified that at the time of the offense defendant lacked substantial capacity to appreciate the criminality of his conduct.

We find no authority to support the proposition that a defense witness has to say the defendant, due to mental illness or disease, lacked the substantial capacity to appreciate the criminality of his conduct when he committed the offense. In People v. Smothers, 55 Ill. 2d 172, 175, 302 N.E.2d 324 (1973), our supreme court held the failure of a witness to express an opinion on defendant's sanity does not decide the issue of whether defendant has raised the affirmative defense. Where there is sufficient evidence based on the testimony and observations of the witnesses to support the defense, the absence of opinion evidence is immaterial. Smothers, 55 Ill. 2d at 175. Neither psychiatric testimony nor medical or lay opinion is necessary to give the instructions if the evidence itself reveals serious mental defects or a substantial history of mental

13

illness. People v. Childs, 51 Ill. 2d 247, 257, 281 N.E.2d 631 (1972); People v. Lono, 11 Ill. App. 3d 443, 448, 297 N.E.2d 349 (1973).

In fact, in the federal courts, witnesses, whether expert or lay, are prohibited from testifying to the ultimate issue of a defendant's "mental state or condition constituting an element of the crime charged or a defense thereto. Such ultimate issues are matters for the trier of fact alone." Fed. R. Evid. 704(b).

The issue we must determine is whether a reasonable jury, hearing the testimony presented by the defense witnesses, could find by clear and convincing evidence that the defendant, due to his mental illness, lacked substantial capacity to appreciate the criminality of his conduct at the time of the crime.

What did the jury hear? At or near the time of the crime the defendant's behavior had changed markedly. His appearance became unkempt, not neat and clean as he had been. He spoke loudly and cursed a great deal. He was paranoid, anxious, and frantic. He was depressed. He watched TV in his car. He told members of his family the FBI was trying to kill him and the CIA was shooting at him. He said he was God--and hit a door until his fist bled. Then there are the bizarre facts of the offense.

No medical witness opined that defendant was insane at the time of the crime, but each ascribed a mental illness to the

defendant.  Dr. Corcoran found the defendant suffered from a bipolar effective disorder or a manic depressive illness.  He referred to it as a "severe psychiatric disease."  Dr. Love's findings of February 2001 were testified to.  They described the defendant as having a paranoid delusional disorder and major depression with recurrent psychotic features.  Dr. Kelly, the State's witness, relying on a June 1, 2004, interview, about three-and-one-half years after the offense, described the defendant as having a bipolar disorder in remission with medication.  On cross-examination, Dr. Kelly agreed Mrs. Dwight's reported observations could be seen as psychotic symptoms.

Our review of the decisions does not disclose any bright line that establishes the occasion for giving the insanity defense instructions.  It remains a matter for the exercise of judicial discretion.  See People v. Douglas, 362 Ill. App. 3d 65, 76, 839 N.E.2d 1039 (2005) (A trial court's refusal to issue a specific jury instruction is reviewed under an abuse of discretion standard).  We can say the trial court must look for the presence of evidence that supports the instructions, avoiding the temptation to make judgments about the weight of it.

We find there was adequate evidence to place the issue of defendant's sanity before the jury.  The jury was free to accept it or reject it, but it had to be properly instructed.  Juries,

15

not judges, weigh the evidence. Failure to instruct was reversible error and it requires that this cause be remanded for a new trial.

II. Other Issues

Because other issues raised by the defendant either fall by the wayside on remand or have little merit we see no need for extended discussion.

We do make these observations, applicable on remand, assuming the testimony will be substantially similar to that of the first trial:

(1) The trial should allow questions of potential jurors directed to their attitude concerning the insanity defense. The question of whether the insanity defense would pose problems for the jury should be asked in some form, but can be more carefully tailored to fit the case. See People v. Stack, 112 Ill. 2d 301, 313, 493 N.E.2d 339 (1986) (The insanity defense remains a subject of intense controversy, known to be subject to bias or prejudice); People v. Gregg, 315 Ill. App. 3d 59, 732 N.E.2d 1152 (2000).

(2) We see nothing wrong with the trial court asking potential jurors, on remand, whether they "believe that a person can have a mental illness or disorder and still be guilty of a crime as charged."

16

1-05-1898

(3) We will not speculate on the contents of defense counsel's discussions with Dr. Corcoran, other than to say we find nothing in the record that persuades us counsel did not understand the legal standards for the presence of insanity.

(4) The trial court should, on request of counsel, instruct the jury that testimony about the contents of reports not admitted into evidence may be considered only for the purpose of weighing the expert witness's credibility or lack of it.

CONCLUSION

We reverse defendant's conviction for armed robbery due to the trial court's failure to instruct the jury on the defense of insanity. Because the evidence is sufficient to support a finding of guilty, we remand this cause for a new trial.

Reversed and remanded.

HOFFMAN, and HALL, JJ., concur.

17