No. 3--08--0366

_____

Filed July 29, 2010

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2010

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Tazewell County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 06--CF--285 |
| KAREN FRANK-McCARRON, | ) ) | Honorable Stephen A. Kouri, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE HOLDRIDGE delivered the opinion of the court:

_____

The defendant, Karen Frank-McCarron, was convicted of first degree murder (720 ILCS 5/9--1(a)(1) (West 2006)), obstructing justice (720 ILCS 5/31--4(a) (West 2006)), and concealment of a homicidal death (720 ILCS 5/9--3.1(a) (West 2006)).  The circuit court sentenced the defendant to 36 years of imprisonment.  On appeal, the defendant argues that: (1) the court erred when it denied her motion to suppress her inculpatory statements to police; (2) the defendant was denied a fair trial because she wore an electronic monitoring device (EMD) during trial; and (3) the court erred when it found that the defendant failed to prove she was insane at the time of the murder.  We affirm.

FACTS

On June 1, 2006, the State charged the defendant with two counts of first degree murder (720 ILCS 5/9--1(a)(1), (a)(2) (West 2006)), two counts of obstructing justice (720 ILCS 5/31--4(a) (West 2006)), and concealment of a homicidal death (720 ILCS 5/9--3.1(a) (West 2006)). The indictment alleged that the defendant killed her three-year-old daughter, Katie, by holding a plastic bag over Katie's head, and then attempted to conceal the circumstances surrounding Katie's death.

The defendant filed a pretrial motion to suppress two inculpatory statements she made to police within days of Katie's death. The circuit court denied the motion, finding that the defendant was not in custody at the time she first confessed and, therefore, was not entitled to receive warnings pursuant to Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), prior to her first confession.

Evidence and testimony presented at the suppression hearing, and at trial, revealed the following facts. On May 13, 2006, the defendant and her mother, Erna Frank, were at the McCarron house in Morton, Illinois, with the defendant's two daughters, Katie and two-year-old Emily. The defendant was a pathologist and spent an hour at work that morning. When she returned, she fed her daughters. After lunch, the defendant put Emily down for a nap. Rather than put Katie down for a nap as well, the defendant decided to take Katie, who had autism, for a car ride to calm her

2

down.  Erna testified that it did not appear as if Katie needed to be calmed down.

The defendant drove Katie to the Frank house, which was near the McCarron house.  Given that Erna was at the McCarron house and Erna's husband was in Germany, the defendant knew that no one would be present at the Frank house.  The defendant parked inside the garage, closed the garage door, and took Katie inside the house.  While inside, the defendant suffocated Katie by placing a white plastic garbage bag over Katie's head.

Approximately 45 minutes to an hour after she left, the defendant returned with Katie to the McCarron house.  The defendant carried Katie into the house, told Erna that Katie was sleeping, and carried her upstairs to bed.

The defendant went about her normal activities after she put Katie in bed around 1 p.m.  Sometime during the afternoon, the defendant's brother, Walter, came to the McCarron house.  The defendant sat in the kitchen with Erna and Walter, who talked to the defendant about a recent trip they took.  While the defendant did not talk much, neither Erna nor Walter noticed any irrational behavior or incoherency in the defendant.

At one point, the defendant decided to go to the grocery store to get ice cream.  After getting the ice cream, the defendant drove back to the Frank house and retrieved the garbage bag she used to suffocate Katie.  The defendant took the bag to a

3

local gas station, where she threw the bag into an outdoor garbage can.

Around 4 p.m., the defendant said she was going to go upstairs to check on Katie, as she normally did not nap that long. The defendant screamed when she went into Katie's room, and told Erna and Walter that Katie was not breathing.

When the police and paramedics arrived, the defendant told a police officer that she found Katie not breathing approximately 2½ hours after she put Katie down for a nap. The officer described the defendant as coherent and conversational. The defendant and a paramedic attempted unsuccessfully to resuscitate Katie. The paramedic described the defendant as unusually calm for the situation. The defendant was quick to respond to questions and answered in an orderly fashion. Katie was transported to the hospital, where she was pronounced dead. The Peoria County deputy coroner testified that, when he spoke with the defendant at the hospital, the defendant did not try to embrace Katie and was largely unemotional. Her demeanor was atypical for a parent whose child had just died.

The defendant's husband, Paul, returned to the McCarron house from North Carolina around midnight that night. Paul had moved to North Carolina with Katie approximately 18 to 24 months prior so Katie could attend a school for autistic children. Katie had returned to Illinois around May 3, 2006. Paul was in

4

the process of moving back to Illinois at the time of Katie's death.

When Paul arrived at the house, he and his brother had to break into the master bedroom and bathroom to find the defendant. The defendant had penned a suicide note and had taken numerous Tylenol pills in an apparent suicide attempt. The defendant told Paul she had killed Katie. She also told her mother that she had killed Katie. When the police arrived, Paul told Officer Brent McLean that the defendant had something she wanted to say. After the defendant did not respond, Paul told McLean that the defendant said she had killed Katie. The defendant was transported to the hospital in an ambulance. Her mother and a police officer accompanied her in the ambulance. The officer did not ask the defendant any questions. At no point was the defendant placed in handcuffs or restrained by the police.

Officer McLean asked the defendant some questions at the hospital in the early morning hours of May 14, 2006. The defendant told McLean that she told Paul she had killed Katie and said, "[l]et's leave it at that." McLean left the room and came back shortly thereafter. McLean asked the defendant where the garbage bag was, but the defendant did not respond. McLean repeated the question, and the defendant said, "I know you want to get evidence on me." She said she wanted to talk to Paul.

5

McLean left the hospital and did not arrange for any police guard on the defendant's room.

The doctor who treated the defendant on May 14, 2006, testified that the defendant was lucid and coherent. The doctor assumed that the defendant was in the medical profession based on the questions she asked of the doctor and because the defendant reviewed her medical charts and commented on them. She also requested to speak with a psychologist. The doctor also stated that intensive care unit (ICU) patients were typically not allowed to use a telephone, but he witnessed the defendant use the telephone outside her room several times between May 14-16. On May 16, the doctor ordered that the telephone usage stop because it was distracting other patients.

The record is unclear as to any restrictions placed on the defendant by the hospital, other than being placed on suicide watch, although Paul testified that he felt the defendant could not have left the hospital if she had wanted to. The record does reflect that friends and family were allowed to visit the defendant in her ICU room. There was no evidence that the defendant wanted to leave the hospital, and the police never put any restrictions on the defendant. The defendant was not placed under arrest at the hospital until the afternoon of May 16, 2006.

On May 14, 2006, the defendant called a friend in the afternoon and told her that she had killed Katie and that she was

going to confess the next day.  She also called Paul's father and told him that she had suffocated Katie with a plastic bag.  Both telephone call recipients described the defendant as calm.

Also on May 14, two Morton detectives talked to the defendant in her hospital room.  The defendant said she might need an attorney, and the detectives told her she was not under arrest and that they just wanted a statement.  The defendant said she did not want to talk.  The detectives asked if they could come back the next day, and the defendant agreed.  The detectives left the hospital.

On May 15, 2006, psychiatrist Sohee Lee was called to talk to the defendant about the Tylenol overdose.  Dr. Lee spoke to the defendant between approximately 6:45 a.m. and 7:30 a.m.  The defendant told Dr. Lee that she had suffocated Katie with a plastic bag.  She said she was feeling guilty because Katie's autism had not been improving and because she had killed Katie.  Dr. Lee testified that the defendant showed no signs of delusion or psychosis.

The evidence indicated that the defendant had a significant preoccupation, if not obsession, with Katie's autism.  Ever since Katie's diagnosis, the defendant worked tirelessly at researching and implementing different treatments for Katie's autism.  Paul testified that the defendant was mostly critical of the progress Katie had made through the various treatments.  The defendant

7

felt responsible for Katie's autism, believing it arose as a result of having Katie vaccinated.

The evidence also indicated that the defendant suffered from depression. In 2005, she began seeing a psychiatrist to help with her severe depression. She was placed on several different medications. She stopped seeing that psychiatrist in early 2006, when she also stopped taking her antidepressants. In addition, the defendant stated that she had been having homicidal thoughts with regard to Katie at various times over the past year. The defendant testified that she made a brief attempt at suffocating Katie with a pillow on May 10, 2006, but the incident only lasted a few seconds.

Around 9 a.m. on May 15, 2006, the Morton detectives, a representative of the Department of Children and Family Services (DCFS), and Paul arrived at the hospital. The detectives stated that Paul wanted to accompany them to the hospital; the detectives did not ask Paul to assist or be present for the interview. Susan Grimm, a friend of the defendant, was in the room. She told Paul that she thought the defendant should have an attorney present. Paul thanked Grimm and escorted her out of the room. Inside the room, the defendant had no objection to the DCFS agent's presence. The detectives told the defendant that she was not under arrest, nor was she going to be taken to the police department. An interview commenced in which the defendant

8

confessed to the murder.  The evidence indicated that everyone was calm during the interview, which had a conversational tone.

Before the end of the interview, the police discussed with the defendant the possibility of doing a second, recorded interview, because it might be desired by the State's Attorney's office.  The defendant agreed to the second interview.  The detectives originally planned on doing just one interview, but they neglected to bring a recording device to the first interview.  The State's Attorney's office did in fact request a recorded interview, and the second interview occurred approximately one hour after the end of the first interview.  Before the second interview, the defendant was read her Miranda rights, which she waived.

During the second interview, the defendant stated that the decision to kill Katie came to her while on the afternoon drive.  She stated that she "just wanted autism out of my life."  She thought she might be able to "cure" Katie by killing her and that "[m]aybe in Heaven she would be complete."  She put the plastic bag over Katie's head because she "wanted a life without the autism," and said that, "[t]o get rid of autism I had to kill a child."  She knew that Katie was dead, but, when she arrived back at the McCarron house, she told Erna that Katie had fallen asleep.  When she devised the plan to dispose of the plastic

9

garbage bag, she thought that she "could get away with [the crime]."

Testimony indicated that the second interview was substantially similar in all respects to the first interview. However, Paul and one of the detectives both testified that the defendant did not repeat in the second interview a comment she made in the first interview about her not wanting to leave any marks on Katie's neck when she suffocated her.

The defendant testified that she believed Katie was freed from autism when she died. On cross-examination, she described the events surrounding Katie's death. She explained that she was standing behind Katie when she placed the bag over her head. She forced Katie to her knees, and Katie lay down. The defendant scrunched up the bag around Katie's neck, and Katie stopped moving after a few minutes. The defendant also admitted that, when she returned to the McCarron house, she wanted to give the impression that everything was normal.

The defendant also stated that, when she was sitting in the kitchen with Erna and Walter, she remembered that she had left the garbage bag at the Frank house. She thought it would be better to dispose of the bag at a local gas station, so she told Erna and Walter she was going to get ice cream. She also admitted that she knew her attempts at resuscitating Katie would be futile.

10

On redirect, the defendant stated that she woke up "very, very suicidal" on May 13, 2006. She felt in turmoil that day as she fought with suicidal and homicidal thoughts.

Both sides presented expert witnesses with regard to the insanity defense asserted by the defendant. The defense presented Dr. Joseph Glenmullen, a psychiatrist who opined that the defendant suffered from major depressive disorder, recurrent, in 2005. Glenmullen stated that the defendant was obsessed with Katie's autism and felt as if she had caused the autism by getting Katie vaccinated. Glenmullen opined that the defendant's depression developed into psychotic depression in 2006, as evidenced by her delusional thoughts such as her statement that she was killing autism when she killed Katie. Dr. Glenmullen acknowledged that the psychiatrist the defendant had been seeing from approximately August 2005 to February 2006 did not observe any delusional thinking in the defendant.

The State presented Dr. Terry Killian, a psychiatrist who opined that the defendant suffered from recurrent major depression. However, Dr. Killian opined that there was no evidence of psychosis in the defendant. Dr. Killian disagreed with Dr. Glenmullen's opinion that the defendant suffered from delusions, stating that the defendant's comment did not fit the definition of delusion as a "fixed false belief." Also, Dr. Killian found it significant that the defendant's statements

11

about the autism were usually about how the autism affected her, rather than Katie.

After the proofs were closed, an issue arose with the fact that the defendant was wearing an EMD on her ankle, which she had been ordered to wear as a condition of her bond. Outside the presence of the jury, the attorneys and the court had a discussion about the EMD. After the parties speculated on how long the defendant had been wearing the EMD and whether the jury could have seen it on her ankle, defense counsel requested that the court admonish the jury about the EMD. After the discussion, the court admonished the jury that the defendant was out on bond and was on electronic home monitoring, but such status did not affect the presumption of innocence.

The jury found the defendant guilty on all counts. After the defendant's motion for a new trial was denied, the court entered judgment of conviction on one count of first degree murder, one count of obstructing justice, and concealment of a homicidal death. The court sentenced the defendant to 36 years of imprisonment. The defendant appealed.

ANALYSIS

I.  Whether the Circuit Court Erred When It Denied the
Defendant's Motion to Suppress

First, the defendant argues that the court erred when it denied her motion to suppress her inculpatory statements to

12

police.  Specifically, the defendant argues that her first statement, given at the hospital on May 15, should have been suppressed because it was obtained without her receiving her Miranda rights.  With regard to the second statement given on May 15, the defendant argues that it should have been suppressed because it was obtained as the result of a deliberate "question first, warn later" strategy in violation of her constitutional rights.

When reviewing a circuit court's ruling on a motion to suppress, we grant great deference to the court's credibility determinations and findings of fact, and will disturb those rulings only if they are against the manifest weight of the evidence.  People v. Slater, 228 Ill. 2d 137, 886 N.E.2d 986 (2008).  However, the court's ultimate ruling on a motion to suppress is subject to de novo review.  Slater, 228 Ill. 2d 137, 886 N.E.2d 986.  In reaching our decision, we will consider the testimony presented at the suppression hearing and at trial.  Slater, 228 Ill. 2d 137, 886 N.E.2d 986.  Further, we note that once a defendant challenges the admissibility of a confession through a motion to suppress, the State has the burden of proving the confession's voluntariness by a preponderance of the evidence.  725 ILCS 5/114--11(d) (West 2006); Slater, 228 Ill. 2d 137, 886 N.E.2d 986.

13

A. Whether the Defendant Was in Custody at the Time She Gave Her

First Statement on May 15

It is well-settled that the preinterrogation warnings required by Miranda, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, are unnecessary if the individual sought to be questioned is not in custody. Slater, 228 Ill. 2d 137, 886 N.E.2d 986. The determination of whether an individual was in custody is an objective one, which requires us to look to the particular circumstances surrounding the encounter and assess whether a reasonable person in that situation would have felt free to terminate the encounter and leave. Slater, 228 Ill. 2d 137, 886 N.E.2d 986; see also People v. Carroll, 318 Ill. App. 3d 135, 742 N.E.2d 1247 (2001) (holding that an individual's subjective belief of whether he or she was in custody is irrelevant to the objective determination). Factors relevant to our inquiry include:

"(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental

14

makeup of the accused." Slater, 228 Ill. 2d at 150, 886 N.E.2d at 995.

With regard to the defendant's first statement, the dispositive question is whether she was in custody at the time she was questioned in the hospital. "Questioning which occurs in a hospital does not amount in itself to custodial interrogation." People v. Bates, 169 Ill. App. 3d 218, 222, 523 N.E.2d 675, 677 (1988); see also People v. Ripplinger, 316 Ill. App. 3d 1261, 739 N.E.2d 71 (2000) (holding that the circumstances surrounding a defendant who was in the ICU when questioned indicated that the defendant was not in custody).

We note that the defendant cites to Carroll and argues that the "most salient factor" bearing on custody in this case is the fact that the defendant was the sole focus of the police investigation. In Carroll, the defendant was the focus of a police investigation after he made an inculpatory statement. However, the defendant in that case was transported by an unmarked squad car to a police station, where he was questioned in an interrogation room. The Carroll court found it significant under the circumstances that the defendant was the sole focus of the investigation. The defendant's attempts to analogize her case to Carroll are of no avail. The fact that the defendant in this case was the sole focus of the police investigation is not as relevant as it was for the defendant in Carroll. The

15

circumstances in Carroll evinced a situation much like a traditional custodial interrogation, which is unlike the situation in which the instant defendant was questioned. Further, as the defendant in this case confessed to numerous people before she gave her statements to police, any investigatory focus beyond the defendant would have been counterintuitive. See, e.g., People v. Vasquez, 393 Ill. App. 3d 185, 913 N.E.2d 60 (2009) (recognizing authority that casts doubt on the importance of a defendant's status as the focus of the investigation).

The totality of the circumstances as uniquely presented in this case militates against a finding that the defendant was in custody at the time she gave her first statement to police in the hospital. The defendant was transported to the hospital in an ambulance. She was accompanied by her mother and one police officer, who did not ask any questions of the defendant. She was not placed under arrest or otherwise restrained by police.

The defendant was initially taken to the emergency room and was later moved to an ICU room, where she was placed on suicide watch. The record is unclear as to any further restrictions placed upon the defendant by the hospital at that time, but there is no evidence that the police restrained the defendant in any way. No guards were placed outside the defendant's room, and no indicia of formal arrest were present.

16

During the early morning hours after the defendant arrived at the hospital, Officer McLean asked the defendant a few questions. There was no indication that McLean pressed the defendant for answers or otherwise coerced the defendant to speak. McLean left the hospital after the defendant told him that she told Paul she had killed Katie and indicated that was all she wanted to say at that time. Further, when she told other officers that she did not want to speak with them that day, they left the hospital. The defendant agreed to allow the officers to return the next day, and she called a friend and said she was going to confess the next day.

The first interview at the hospital began around 9 a.m. and lasted about an hour. Only two detectives were present at the interview, along with a DCFS agent and Paul. The defendant did not object to the DCFS agent's presence, and Paul's presence was not solicited. There was no evidence to suggest that the police used Paul as a coercive tool. The first interview was conversational in nature, and there was no evidence to suggest that the defendant was coerced into answering the detectives' questions.

The defendant was a 37-year-old pathologist. She was highly educated and intelligent, and even reviewed her own medical charts on the day she was admitted to the hospital. While she was suffering from depression, there was no evidence to suggest

17

that her depression was somehow exploited by the detectives.  All of the individuals who had contact with the defendant around the time of the murder and suicide attempt described her as calm, lucid, and coherent.

In light of the aforementioned factors, we conclude that a reasonable person in the defendant's position would have felt free to terminate the encounter.  The evidence indicates that the defendant wished to speak to the police about the incident.  Because the evidence supports the court's finding that the defendant was not in custody at the time she gave her first statement to police at the hospital, there was no need to give the defendant <u>Miranda</u> warnings before she gave her statement.

Even if a <u>Miranda</u> violation had occurred in this case, the admission of the defendant's first statement into evidence would not have prejudiced the defendant.  The defendant made inculpatory statements to six people before her statements to police.  Given these other confessions, as well as the other strong evidence of guilt produced at trial, the evidence in this case was not closely balanced.  Accordingly, any error in admitting the defendant's first statement would have been harmless.  See, <u>e.g.</u>, <u>Arizona v. Fulminante</u>, 499 U.S. 279, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991) (holding that the admission of involuntary confession can be harmless error).

B.  Whether the Defendant Was Subjected to a Deliberate

"Question First, Warn Later" Strategy

With regard to the defendant's second statement, before which she was read her <u>Miranda</u> rights, the defendant claims that she was subjected to a deliberate "question first, warn later" strategy in violation of her constitutional rights.

Under the question first, warn later technique, police officers elicit an incriminating statement from an individual without having given <u>Miranda</u> warnings. <u>People v. Lopez</u>, 229 Ill. 2d 322, 892 N.E.2d 1047 (2008). Next, the police read the individual his or her <u>Miranda</u> warnings, and again obtain an incriminating statement. <u>Lopez</u>, 229 Ill. 2d 322, 892 N.E.2d 1047. When police deliberately use this technique, the statement obtained after <u>Miranda</u> warnings were read will be excluded from evidence, unless some curative measure was taken. <u>Lopez</u>, 229 Ill. 2d 322, 892 N.E.2d 1047.

In this case, the evidence supports the conclusion that the police did not deliberately use a question first, warn later technique. In the time after the incident and leading up to the confession, the police were not forceful in attempting to obtain a statement from the defendant. The police intended to obtain just one statement from the defendant. The only reason they sought and obtained a second statement is because the first statement was mistakenly not recorded and an assistant State's Attorney requested that the police obtain a second, recorded

19

statement. There is nothing in the record to indicate that the police acted to circumvent <u>Miranda</u>'s protections. Accordingly, we hold that no error existed in admitting the defendant's second statement into evidence.

C. Whether the Defendant's Statements Were Obtained in Violation of Her Fifth Amendment Right to Counsel

The defendant also argues, in the alternative, that the court erred when it denied her motion to suppress because her statements to police were obtained after she invoked her fifth amendment right to counsel on May 14.

A fifth amendment-based request for counsel is inconsequential until a defendant is taken into custody. See <u>People v. Villalobos</u>, 193 Ill. 2d 229, 737 N.E.2d 639 (2000). We have already held that the defendant was not in custody at the time she gave her first statement on May 15. Much of the evidence supporting that holding existed at the time the defendant stated on May 14 that she might need an attorney. As previously noted, the defendant had been transported to the hospital via ambulance, in which she was accompanied by her mother and a police officer who did not ask her any questions. At no point was the defendant subjected to any means of formal arrest. Officer McLean asked the defendant some questions in the early morning hours of May 14, but left after the defendant indicated she did not want to continue answering questions. The

20

two detectives questioned the defendant briefly on May 14, but left after she indicated she did not want to talk. Under these circumstances, we hold the defendant was not in custody on May 14 at the time she told the two detectives that she might need an attorney. Because the defendant was not in custody when she said on May 14 that she might need an attorney, we reject the defendant's alternative basis for challenging the court's decision to deny her motion to suppress. See Villalobos, 193 Ill. 2d 229, 737 N.E.2d 639.

## II.  Whether the Defendant Was Denied a Fair Trial Because She Wore an EMD During Trial

Second, the defendant argues that she was denied a fair trial because she wore an EMD on her ankle during trial. The defendant acknowledges that she has forfeited this argument for appellate review by failing to raise it in a posttrial motion; however, she requests this court review the issue for plain error.

The plain error doctrine permits appellate review of a forfeited issue when the defendant proves that an error occurred and that either the evidence is closely balanced or the alleged error is so substantial that it deprived her of a fair trial. People v. Herron, 215 Ill. 2d 167, 830 N.E.2d 467 (2005). Accordingly, we must first determine if error in fact occurred. Herron, 215 Ill. 2d 167, 830 N.E.2d 467.

21

Generally, EMDs are devices used to monitor the defendant's presence or nonpresence in his or her home while on electronic home detention (730 ILCS 5/5--8A--2(A) (West 2006)). A court can order an individual to wear an EMD as a condition of a bond. 725 ILCS 5/110--10(b)(14) (West 2006). Contrary to statements made by the defendant in her appellant's brief, the court did not order the defendant to wear an EMD during trial. Rather, the defendant had been ordered to wear the EMD as a condition of her bond, an order firmly within the court's discretion (725 ILCS 5/110--10(b)(14) (West 2006)). Without more, there was no error in ordering the defendant to wear an EMD as a condition of her bond.

The defendant attacks the fact that the defendant's EMD remained on her ankle during trial by making a conclusory statement that the EMD was analogous to shackles. Even if we ignore this second forfeiture of the issue (210 Ill. 2d R. 341(h)(7) (arguments in appellate briefs require citation to authorities relied upon)), the defendant's claim is without merit. EMDs are not physical restraints like shackles, which a court can order a defendant to wear at trial when "necessary to prevent escape, to protect the safety of those in the courtroom, and to maintain order during trial" (People v. Allen, 222 Ill. 2d 340, 365, 856 N.E.2d 349, 363 (2006)). Further, EMDs do not interfere with a defendant's ability to participate in her own

22

defense, which is one of the chief concerns with shackles (<u>Allen</u>, 222 Ill. 2d 340, 856 N.E.2d 349).

We recognize that an EMD may be similar to shackles in that its presence could possibly have a negative impact on the jury's opinion of the defendant. However, the court addressed these concerns in an admonishment to the jury. The record reflects that the defendant's EMD was not addressed until after the proofs had been closed, when the attorneys and the court discussed the issue outside the presence of the jury. During the discussion, defense counsel requested that the court admonish the jury that the EMD does not affect the presumption of innocence. After the discussion, the court in fact admonished the jury that the defendant was out on bond and was on electronic home monitoring, but such status did not affect the presumption of innocence. Accordingly, any negative impact an EMD could have on the jury's opinion of the defendant was not a concern in this case.

For the foregoing reasons, we hold that the defendant has failed to show that an error occurred when the defendant wore an EMD at trial. Therefore, we reject the defendant's argument.

III. Whether the Defendant Proved She Was Insane at the Time of the Murder

Third, the defendant argues that she proved she was insane at the time of the murder. The defendant claims that the State did not "adequately rebut" the opinion of her expert that she

23

could not appreciate the criminal nature of her actions at the time of the murder because she suffered from psychotic depression.

Section 6--2(a) of the Criminal Code of 1961 provides that "[a] person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6--2(a) (West 2006). The defendant has the burden of proving insanity by clear and convincing evidence. 720 ILCS 5/6--2(e) (West 2006). We will not disturb a jury's resolution of an insanity issue unless it is against the manifest weight of the evidence. People v. Johnson, 146 Ill. 2d 109, 585 N.E.2d 78 (1991).

When assessing a defendant's sanity, the trier of fact is free to reject all expert testimony and base its conclusion on lay testimony alone. People v. Dwight, 368 Ill. App. 3d 873, 859 N.E.2d 189 (2006). In this case, Dr. Glenmullen opined that the defendant suffered from psychotic depression at the time of the murder. Dr. Glenmullen placed great emphasis on what he believed were delusional thoughts in the defendant, including the defendant's statement that she was killing autism when she killed Katie. Dr. Killian disagreed, opining that the defendant was neither delusional nor psychotic. The jury was free to reject Dr. Glenmullen's opinion, even if the State had not presented a

24

contrary expert opinion. See People v. Urdiales, 225 Ill. 2d 354, 871 N.E.2d 669 (2007).

Other relevant considerations in an insanity determination include: (1) the testimony of lay witnesses who observed the defendant around the time of the crime; (2) whether the defendant planned the crime; and (3) whether the defendant attempted to conceal the crime. Dwight, 368 Ill. App. 3d 873, 859 N.E.2d 189. "A defendant's unusual behavior or bizarre or delusional statements do not compel a finding of insanity, and a defendant may suffer from a mental illness without being legally insane." Dwight, 368 Ill. App. 3d at 880, 859 N.E.2d at 195.

In this case, the evidence and testimony support the jury's rejection of the insanity defense. While the defendant testified that the decision to kill Katie came to her while on the afternoon drive, the facts evince a calculated plan to kill Katie and conceal the circumstances surrounding her death. The defendant drove to the Frank house, where she knew no one would be home. She pulled into the garage and closed the garage door. She suffocated Katie with a plastic bag, then placed her body into the car and drove her back to the McCarron house. The defendant lied to Erna about Katie being asleep, then placed Katie into bed to make it appear as if Katie was simply napping. While acting as if everything was normal, the defendant remembered the plastic bag at the Frank house and devised a plan

25

to dispose of the bag to conceal evidence of the crime. The defendant knew she had killed Katie, and she attempted to convince everyone that Katie had stopped breathing in her sleep. The defendant even engaged in resuscitation efforts that she knew would be futile in an attempt to maintain the ruse. Further, all of the individuals who had contact with the defendant around the time of the crime described her as calm, lucid, and coherent. Under these circumstances, we hold that the jury's rejection of the insanity defense was not against the manifest weight of the evidence.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Tazewell County is affirmed.

Affirmed.

CARTER, J., concurs

JUSTICE WRIGHT, specially concurring:

I agree with the majority's analysis on all issues except the issue related to the electronic monitoring device. I agree with the majority that this defendant has forfeited the electronic monitoring device issue and also failed to meet her burden of proof as to plain error.

Here, the presence of the electronic monitoring device was brought to the court's attention after the close of the evidence and defendant requested a curative instruction for the jury.

26

After receiving the curative instruction, the defense did not raise the issue in a post trial motion.  Consequently, we can only review this claim of error if defendant can establish plain error.  Since the evidence was not closely balanced and defendant received a curative instruction to insure the fairness of the proceedings, I join the majority's conclusion that plain error does not exist.

Once the majority determined that no error occurred, I respectfully suggest that any  discussion of whether an electronic monitoring device "may be similar to shackles" is unnecessary. Consequently, I agree with the State that this is a "faux shackling issue."  Therefore, I do not adopt the views of the majority on this issue beyond the conclusion that the electronic monitor issue has been forfeited by the defense.  For this reason, I specially concur.