2024 IL App (2d) 230307-U
No. 2-23-0307
Order filed August 12, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-CF-1325 |
| | ) | |
| TRAVIS TURNER, | ) ) | Honorable John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice McLaren and Justice Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's finding that the defendant was guilty but mentally ill of aggravated battery was not against the manifest weight of the evidence where there was lay testimony that the defendant understood the criminality of his actions.

¶ 2    The defendant, Travis Turner, was charged with attempted murder (720 ILCS 5/8-4 (West 2020)), aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2020)), and aggravated battery of a nurse (720 ILCS 5/12-3.05(d)(11) (West 2020)) while at the Elgin Mental Health Center (EMHC). Following a bench trial, the defendant was acquitted of the attempted murder charge and found guilty but mentally ill on the three counts of aggravated battery. The counts of conviction merged

for sentencing purposes, and he was sentenced to 30 months of probation with mental health treatment. In this timely-filed appeal, the defendant argues the trial court erred by finding him guilty but mentally ill instead of not guilty by reason of insanity. We affirm.

¶ 3                                     I. BACKGROUND

¶ 4      The defendant was brought to EMHC on July 13, 2021, after a visit to the emergency room. The defendant, then 18 years old, reported that he saw snake eyes in family members and on television, said things that did not make sense, and heard screaming in his head. A toxicology test conducted in the emergency room showed cannabis in his system. Hospital staff suggested he may have ingested synthetic or laced cannabis. The hospital believed the defendant needed a higher level of psychiatric care and the defendant voluntarily agreed to be admitted to EMHC.

¶ 5      At EMHC, the defendant was housed in a building called the Brunk Unit. The Brunk Unit had four hallways containing male dormitories, female dormitories, administrative offices, and a conference room. The dormitory hallways were very wide and contained tables and seating for patients to eat or play games. The Brunk Unit's nursing station was in the center and oversaw all four hallways. The Brunk Unit's security desk was also located in the center near the nursing station and oversaw all four hallways.

¶ 6      On July 17, 2021, around 7:30 in the morning, the defendant reported to a security officer, Latanya Gray, that he was experiencing auditory hallucinations. Gray took him by the hand and brought him to the night nurse. Gray requested medication for the defendant, but the night nurse refused and gave him Benadryl instead. The defendant was then placed on one-to-one watch, under which a staff person was required to keep constant visual surveillance of him and make note of his activities and symptoms.

¶ 7    Around 9:30 that morning, Gray heard the victim, Rinah Ortega, tell the defendant that he could lie down on his bed but could not close the door.  The defendant then punched Ortega in the head twice while they were in the hallway outside his room.  Ortega fell and hit her head on the concrete floor.  The defendant hit Ortega again while she was unconscious on the ground.  Staff members immediately responded, telling the defendant to stop, moving him into his room, and assisting Ortega.

¶ 8    Gray and Yasmine Butler, a mental health tech trainee at EMHC, both testified at trial that, in response to the orders, the defendant immediately stopped hitting Ortega and went into his room.  However, John Brinkley and Jeremy Jackson, security officers at EMHC who responded to the attack, testified that it took approximately 15 minutes after the attack to restrain the defendant, who actively resisted security officers by kicking, punching, and biting.  Additionally, several witnesses testified that the defendant repeatedly banged his head against the wall saying that "he felt like hitting someone."  Gray testified that, after the attack, the defendant said that Ortega "was the devil" and he was "told to do it."  An emergency request was made to the Illinois Department of Human Services to transport the defendant to the maximum-security mental health facility at the Chester Mental Health Center.  The request was granted, and the defendant was transferred the same day.

¶ 9    Ortega was taken to the hospital after the attack.  Ortega lost a significant amount of blood, requiring 22 towels to control the bleeding.  She was placed in a medically induced coma and remained in the hospital for about a month.  Ortega testified at trial that she had no recollection of the events of the day or even having the defendant as a patient.  She continued to suffer from her injuries, including chronic headaches, blurred vision, ringing in her ear, and memory loss.

¶ 10    A few days after the attack, the defendant agreed to an interview with Detective Scott St. John of the Elgin police department. The interview was recorded on Detective St. John's body camera and the full recording was entered into evidence at trial. During the interview, the defendant expressed remorse, but also stated that he believed Ortega was an alien and he would not feel bad if she was an alien. The defendant told Detective St. John that he did not intend to kill Ortega and expressed relief when Detective St. John informed him Ortega would not die. The defendant told Detective St. John that he was trying to get out of Elgin. The defendant read on a document that he needed to act "hostilic" in order to get out. In pursuit of this, he decided that he would hit "the lady." When he was making this plan, another patient, with whom the defendant did not share his plan, walked by and signaled for the defendant to hit Ortega. The defendant attacked Ortega immediately after this. During the interview, the defendant stated that he wished he had just pushed Ortega instead.

¶ 11    The defense called an agreed expert, Dr. Elisa Lancaster, to establish the defense of insanity. Dr. Lancaster evaluated the defendant twice. First, in February 2022, Dr. Lancaster performed a court-ordered evaluation related to a motion for bond reduction. This evaluation occurred over two days and included psychological testing and a clinical interview. The purpose of this evaluation was to determine the defendant's current mental state and make recommendations for future treatment.

¶ 12    The second evaluation occurred in March 2023 and its purpose was to assess the defendant's sanity at the time of the attack. This evaluation included reviewing police records, hospital records, jail records, and information from the first psychological evaluation. After reviewing this information, Dr. Lancaster diagnosed the defendant with schizophreniform disorder, a form of schizophrenia with a duration of symptoms lasting only one to six months.

Dr. Lancaster noted that the defendant's symptoms included urinating on himself, banging his head on glass, referring to himself as God, chewing and spitting out food, and auditory and visual hallucinations. She said the symptoms started after the defendant's first 24 hours in EMHC and did not occur while he was at the Chester Mental Health Center but reemerged when he was in Kane County jail and lasted until November 2021. Dr. Lancaster stated that she could not rule out the influence of substances, but there were no indications that substances played a role in his symptoms. Dr. Lancaster concluded that the defendant was insane at the time of the attack. However, during cross-examination, Dr. Lancaster admitted that the defendant telling the police about his plan to get out of EMHC could show an understanding of the criminality of his actions.

¶ 13 The trial judge questioned Dr. Lancaster about whether there was a difference between her phrasing of "understanding the consequences of his actions" and the statutory language of "substantial capacity to appreciate the criminality of his actions." Dr. Lancaster responded: "They're similar. And so when I am looking at it, I'm looking at doesn't a person—to understand that it's a criminal act or understand the criminality of an action, you would need to know that there's potential consequences for those actions; and then to understand that if you continue or proceed with the action, that it could result in consequences. I think that's how I'm viewing it." The State did not call a rebuttal expert.

¶ 14 On July 14, 2023, the trial court issued a written order finding the defendant not guilty of attempted murder and guilty but mentally ill of the three counts of aggravated battery. With respect to the insanity defense, the court considered the expert testimony of Dr. Lancaster and the lay testimony of the witnesses. The trial court found the defendant was not insane at the time of the attack despite his diagnosis of schizophreniform disorder. The trial court stated that Dr. Lancaster's use of "understand the consequences of his actions" versus the statutory language was

not adequately explained. The trial court also believed there were some anomalies in Dr. Lancaster's testimony that "do not completely undermine her opinion, [but] they do highlight some unexplained reliability factors." The trial court further explained that the trial evidence showed the defendant understood the criminality of his actions because he planned the attack in advance and complied with authority after the attack by immediately stopping and going into his room. Additionally, the defendant expressed sorrow and regret a few days later when he was interviewed by Detective St. John. The trial court sentenced the defendant to 30 months of probation with mental health treatment. The defendant unsuccessfully moved to reconsider the guilty verdict. The defendant then filed this appeal.

¶ 15                                II. ANALYSIS

¶ 16    On appeal, the defendant argues the trial court's rejection of his affirmative defense of insanity and finding that he did not lack the substantial capacity to appreciate the criminality of his conduct was against the manifest weight of the evidence. In Illinois, a person is not criminally responsible for his conduct if, at the time of the conduct, he suffered from a mental disease or defect such that he lacked the substantial capacity to appreciate the criminality of his conduct. 720 ILCS 5/6-2(a) (West 2012). When a defendant raises the affirmative defense of insanity, he bears the burden of proving by clear and convincing evidence that he is not guilty by reason of insanity, while the State retains the burden of proving the defendant guilty beyond a reasonable doubt. *Id.* § 6-2(e).

¶ 17    Whether a defendant was sane at the time of an offense is generally a question for the trier of fact. *People v. Plackowska*, 2020 IL App (2d) 171015, ¶ 48. A reviewing court will not disturb the trier of fact's resolution on the issue of an insanity defense unless it is against the manifest weight of the evidence. *People v. Frank- McCarron*, 403 Ill. App. 3d 383, 396 (2010). A finding

is against the manifest weight of the evidence only where the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence presented. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). "We will not substitute our judgment for the trial court's regarding the weight of the evidence, the credibility of the witnesses, or the inferences to be drawn from the evidence." *People v. McCullum*, 386 Ill. App. 3d 495, 505 (2008). "A reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the fact finder." *Bazydlo v. Volant*, 164 Ill. 2d 207, 214 (1995).

¶ 18     As the defendant bears the burden of proving insanity, "the State does not need to present expert testimony on the issue of sanity but may rely purely on facts in evidence and the inferences that follow from those facts." *People v. Romero*, 2018 IL App (1st) 143132, ¶ 63. " '[W]hile it is within the province of the trier of fact as the judge of the witness' credibility to reject or give little weight to * * * expert psychiatric testimony, this power is not an unbridled one,' and a trial court may not simply draw different conclusions from the testimony of an otherwise credible and unimpeached expert witness." *People v. Kando*, 397 Ill. App. 3d 165, 195 (2009) (quoting *People v. Baker*, 253 Ill. App. 3d 15, 30 (1993)). "The trier of fact may entirely reject expert testimony if it concludes that the defendant was sane based on factors such as lay testimony based on observations made shortly before or after the crime, the existence of a plan for the crime, and methods undertaken by defendant to prevent detection." *Romero*, 2018 IL App (1st) 143132, ¶ 63. "Bizarre behavior or delusional statements do not compel an insanity finding as a defendant may suffer mental illness without being legally insane." *McCullum*, 386 Ill. App. 3d at 504.

¶ 19     We cannot say the trial court's ruling was against the manifest weight of the evidence. The trial court's decision was based on evidence that the defendant had a plan to escape EMHC. The

defendant told detective St. John that he believed he needed to act "hostilic" to get out of EMHC so he planned to attack Ortega. Dr. Lancaster admitted on cross-examination that this could show that the defendant understood the criminality of his actions. Additionally, the trial court relied on the testimony of Gray and Butler that the defendant complied with orders immediately after the attack. The trial court concluded that the defendant's plan and his compliant behavior after the attack showed that he was sane at the time of the attack.

¶ 20 The defendant's reliance on *Kando* is inapposite. In that case, the defendant, Amir Kando, suffered from schizoaffective disorder and attacked a neighbor with a knife. 397 Ill. App. 3d at 172-73. At trial, two experts testified that Kando was insane at the time of the offense. *Id.* at 178. The trial court rejected both experts' testimony and found that Kando was not legally insane. *Id.* at 193. The appellate court reversed, holding that there was no basis for the trial court to reject the expert testimony. *Id.* at 197. The court found that, "No one suggested an alternative motive for defendant's attack other than to eliminate Satan pursuant to a commandment from God. No one suggested or imputed any other design or motive to explain defendant's actions other than his delusion, namely that the victim was Satan whom he was determined to kill or incarcerate for 1,000 years." *Id.* at 196.

¶ 21 Here, by contrast, there is an alternate explanation for the defendant's attack aside from an insane delusion that may have caused him to believe Ortega was the devil or an alien. The defendant planned the attack on Ortega to try and get out of EMHC. The expert admitted that this could be evidence that the defendant understood the criminality of his actions. The trial court's determination was thus supported by this admission and the lay witness testimony and was not against the manifest weight of the evidence.

¶ 22                                          III. CONCLUSION

¶ 23    For the reasons stated, the judgment of the circuit court of Kane County is affirmed.

¶ 24    Affirmed.